**Johnson WISDOM, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–94–861.

Court of Criminal Appeals of Oklahoma.

May 22, 1996.

Paul S. Faulk, Norman, Joseph O. Minter, V, Madill, for Appellant at trial.

John Lawson, Tishomingo, for the State at trial.

William H. Luker, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## OPINION

STRUBHAR, Judge:

Appellant, Johnson Wisdom, was charged with First Degree Murder in violation of 21 O.S.1991, § 701.7, in the District Court of Johnston County, Case No. CF–94–10. The State filed a Bill of Particulars alleging that the murder was especially heinous, atrocious or cruel. The jury found Appellant guilty of the crime charged and found the alleged aggravating circumstance to exist. Appellant was sentenced to death. From this judgment and sentence Appellant has perfected his appeal to this Court.

## FACTS

Three and one-half year-old Alton Wisdom was admitted to the emergency room at Valley View Regional Hospital in Ada, Oklahoma, shortly before 9:00 p.m. on February 1, 1994. The child was stuporous, unresponsive and had one fixed pupil. His body and head were covered with several bruises. A CAT scan showed him to have a large subdural hematoma over the left hemisphere of his brain. Subsequent surgery and other treatment failed to remedy the brain injury. The child remained comatose and never regained consciousness. When he was finally diagnosed to be brain dead, the respirator was turned off and the child died on February 8, 1994.

Johnston County Deputy Sheriff, Vernon Williams, was called shortly after Alton was taken to the emergency room by his mother, Polly Wisdom, and Appellant. After Williams arrived at the hospital, he met with Polly who told him she had knocked the child off the porch. Next, Williams met with Appellant who told him that he was not present when Alton was injured but Polly had told him Alton had fallen from the porch. After Appellant was interviewed, Williams spoke again with Polly who told him that at around 5:00 or 6:00 p.m. on February 1, she went to town with her other two children, Jerry and Michelle. She said she wanted to take Alton with her but Appellant wouldn't let her. While they were gone, Alton was left alone with Appellant. When they arrived home approximately two hours later, at 7:00 or 8:00 p.m., Alton was lying on a mattress in the living room and Appellant was kneeling over him. Alton was unconscious but breathing. Polly told Appellant they would have to take Alton to the hospital. Appellant did not want to because he feared that he would be arrested. Appellant and Polly agreed to make up a story so he would not be arrested. Based upon the story Polly told during this second interview, Appellant was arrested for child abuse.

After Appellant's arrest, he was interviewed the following day, February 2, at the Johnston County Sheriff's Office by Criminal Investigator Judy Hutchins. This interview, which was video-taped, took place after Appellant was advised of his *Miranda*[1] rights. Appellant told Hutchins that when he and Polly were married he wanted to have another baby but Polly said she couldn't. Then, Polly became pregnant by another man and divorced Appellant. Polly and Appellant got

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

back together but Appellant resented Alton because he was another man's child. Because of Appellant's feelings toward Alton, he had a difficult time being around him and feared he would seriously injure Alton. Appellant told Hutchins he had been hitting and injuring Alton since August.

When speaking specifically about what had happened the previous day, Appellant mentioned several things he had done to Alton with the intention of hurting him and making him cry. He remembered he had hit Alton's head with the palm of his hand several times—possibly more than five times. He had also knocked Alton off the porch twice while playing basketball with him. When Alton was on the ground, Appellant had rolled over the child's head a couple of times.

At trial, Dr. Charles Borne, the neurosurgeon who treated Alton, testified on direct examination that the head injury Alton had sustained, a subdural hematoma, was under twelve hours old when he discovered it. Dr. Borne testified that this injury could have been caused by numerous strikes to the head with an open hand. On cross examination, Dr. Borne acknowledged that he had in an earlier report found that the injury was from twelve to twenty-four hours old when he discovered it. He acknowledged at trial that this was possible. It was also revealed on cross examination that in this earlier report, Dr. Borne had found the most likely cause of the hematoma to be severe shaking of the child. Dr. Borne testified that such was his opinion at the time he made the report and he still held that opinion. He explained that this type of injury occurs when the head rotates back and forth and the brain becomes injured by bumping into the skull. This type of injury is compatible with the severe shaking of a child. The doctor also noted that bruises found on the child's back and shoulders were compatible with this as well.

## PROPOSITIONS RELATING TO FIRST STAGE PROCEEDINGS

Appellant argues in his first proposition that the evidence was insufficient to support his conviction. The evidence relied upon by the State at trial was both direct and circumstantial. Accordingly, this Court will sustain Appellant's conviction if, after viewing the evidence in the light most favorable to the State, this Court determines that any rational trier of fact could have found the essential elements of the crime charge to exist beyond a reasonable doubt. *Spuehler v. State*, 709 P.2d 202, 203 (Okl.Cr.1985).

Appellant notes that expert testimony indicated the cause of death was the subdural hematoma and its resulting injury to the brain. It is not with the cause of death that Appellant takes issue, but rather with the evidence of how the injury was caused. Dr. Borne testified specifically about two actions which could have caused this injury, severe shaking and repeated hitting of the child's head with the palm of an open hand. While Appellant did not confess to shaking the child, and no evidence was introduced which indicated that he had shaken the child, Appellant did confess to having repeatedly hit the child's head with the palm of his hand a few hours before the child was taken to the hospital.

It is Appellant's position that the State's case falls short of proving that the subdural hematoma was caused by repetitive blows to the child's head. Appellant argues that this possibility goes against the weight of the circumstantial evidence. He maintains that a repeated slapping across the head would necessarily result in a side to side motion which would not cause the injury suffered in this case. With this argument Appellant disregards the possibility that the child could have been repeatedly slapped on the back of his head thereby causing the front to back head rotation that could have resulted in the type of injury incurred in this case. Appellant also argues that the bruises found on the child's shoulders and back corroborate shaking and not slapping. While Dr. Borne did testify that these bruises were consistent with the child having been shaken, this does not diminish the possibility that the admitted blows to the child's head caused the hematoma. Finally, Appellant finds it significant that there was no testimony regarding external injuries to the scalp. Acknowledging that he observed no scalp bruises when he first examined the child, Dr. Borne testified that there may not have been time for bruis-

es to form since the child had been injured. This, again, does not diminish the possibility that the fatal hematoma was inflicted by Appellant's repeated strikes to the child's head.

The facts indicate that the child died of a subdural hematoma. The injury could have been under twelve hours old when discovered. Appellant admitted to having hit the child's head repeatedly with the palm of his hand during this time period. Dr. Borne testified that this could have caused the hematoma. This Court finds this evidence sufficient to support Appellant's conviction beyond a reasonable doubt.

■ In his second proposition, Appellant complains that error occurred because the Information charged him with causing the wounds which resulted in the child's death but the jury was instructed that they could convict Appellant if they found he either committed the crime himself or advised and encouraged someone else to do so. It is Appellant's position that because the Information alleged that he had committed the acts which caused the child's death, the jury should only have been allowed to convict him upon a finding that he *actually* committed the acts charged. He claims that by instructing the jury that he could be found guilty if he aided and abetted the crime, the jury was allowed to convict him upon a "radical new theory" of guilt which was not charged.

■ Appellant's assertion that the instruction on aiding and abetting improperly introduced a new, uncharged, theory of guilt into the trial is without merit. This Court has held that "[t]he information need not specifically allege that the defendant aided and abetted the offense." *Rounds v. State,* 679 P.2d 283, 287 (Okl.Cr.1984). The Information is required only to allege those facts required to charge the crime against the defendant. *Id. See also Hackney v. State,* 874 P.2d 810, 814 n. 8 (Okl.Cr.1994). Accordingly, the trial court did not err in instructing the jury on the law of aiding and abetting.

■ It is Appellant's argument in his third proposition that the Information failed to allege facts to support each element of the

crime charged and therefore, the trial court was without subject matter jurisdiction over the case. This Court very recently revisited this issue in *Parker v. State,* 917 P.2d 980, 985–87 (Okl.Cr.1996), wherein it was noted that "a trial court's jurisdiction is triggered by the filing of an Information alleging the commission of a public offense with appropriate venue." *See also* 22 O.S.1991, §§ 121–136. In *Parker,* this Court overruled prior case law, including *Miller v. State,* 827 P.2d 875 (Okl.Cr.1992), to the extent it held that in order for an Information to confer jurisdiction upon a trial court, it must state facts alleging every material element of the crime charged. A review of the Information filed in the present case reveals that it was sufficient to confer jurisdiction on the trial court in that it alleged that Appellant had committed First Degree Murder in Johnston County.

■ Separate from the jurisdictional issue, lie state and federal due process requirements. Not every Information which is sufficient to confer jurisdiction upon the trial court is sufficient insofar as state and federal constitutional due process requirements are concerned. Both state and federal due process clauses require that an Information be sufficient to put an accused on notice of the charges against him. "Where the Information alleges an offense and pleads particular facts constituting the offense in ordinary language, such that a person of common understanding can know what is intended and prepare a defense to the charge, no due process violation occurs." *Parker,* 917 P.2d at 985–87. However, when an Information falls short of sufficiently apprising an accused of what he or she must defend against at trial, a due process violation will not always have resulted. In order to make this determination on appeal, this Court will look to the entire record including discovery and preliminary hearing transcripts to ascertain whether the accused received satisfactory notice. If, upon a review of this record, it is determined that the accused had sufficient notice, no due process violation will be found. *Id.*

■ The Information in the present case charged the Appellant as follows:

That on that day and year and in the County and State aforesaid the said JOHNSON WISDOM did unlawfully, willfully, and feloniously, without authority of the law, cause the death of ALTON WISDOM, a human being, a child of the age of 3½ years, as a result of willful injuring, or using unreasonable force by said defendant towards and upon the child, did then and there kill one ALTON WISDOM by means of using unreasonable force on the body of the said ALTON WISDOM, causing mortal wounds in the body of the said ALTON WISDOM from which mortal wounds the said ALTON WISDOM did languish and die, contrary to the form of the Statutes, in such cases made and provided, and against the peace and dignity of the State.[2]

Appellant notes that the charging language is general and does not assert specific acts which could be alleged to have caused injury such as hitting, kicking or slapping, for instance. While this is true, the record supports a finding that Appellant had notice of the specific means by which the State intended to prove that he had caused the child's death. Appellant's own statement provided the most detailed account of specific acts of willful injuring and unreasonable force and Appellant clearly had notice of this. Accordingly, it can be found that prior to trial, Appellant was put on notice of what he would be required to defend against at trial. Because Appellant's right to due process was not violated, relief is not warranted.

■ Appellant's fourth proposition concerns jury instructions. In its first stage jury instructions the trial court properly instructed the jury on several lesser included offenses. Defense counsel also requested the trial court to include in its first stage instructions the ranges of punishment for the lesser included instructions. The trial court declined to do so and Appellant contends on appeal that this decision was in error.

Appellant acknowledges that 21 O.S.Supp. 1993, § 701.10 provides for a separate sentencing stage to determine punishment in a capital murder proceeding. Appellant also notes that bifurcation is not required for non-

capital unenhanced offenses. 22 O.S.1991, § 926. *See also Reed v. State*, 657 P.2d 662, 665 (Okl.Cr.), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 307 (1983). It is Appellant's position that because the relevant authority does not prescribe procedure for dealing with lesser included offenses in a capital proceeding, both procedures can be given effect in the same case. He contends that a bifurcated proceeding could take place with respect to the capital murder charge while the sentencing option for the lesser included offenses could be given to the jury in the first stage. Under this procedure, if the jury finds the defendant guilty of a lesser included offense instead of first degree murder, they could sentence him in a single stage proceeding in the same manner as a first offender would normally be sentenced. If the jury finds the defendant guilty of first degree murder, punishment would be assessed in a second stage of the trial.

Assuming, *arguendo*, that this could properly have been done, Appellant has presented no compelling reason why it should have been done. Appellant asserts that the jury may have had doubts as to whether he caused the injuries which resulted in the child's death. He contends that under such circumstances, if the jury had known that child abuse is a felony offense carrying up to life imprisonment, they may have convicted him of this offense rather than First Degree Murder. The first stage jury instructions were sufficient to preclude any error in this regard as they instructed the jury that Appellant could only be convicted upon a finding of guilt on each element beyond a reasonable doubt. Accordingly, if the jury seriously doubted that Appellant had caused the fatal injuries, it follows that they would not have found him guilty of First Degree Murder.

■ The bifurcated proceeding required the jury to consider only whether Appellant was guilty or not guilty in the first stage deliberations. Such is entirely proper as a finding of guilt should be based upon consideration of whether the evidence supports the crime charged and not upon possible punishment options.

2. Original Record 1.

Appellant was interviewed by Judy Hutchins, an investigator with the Johnston County District Attorney's Office, on February 2, 1994, the day after he was arrested. This interview was video taped and played for the jury at trial. Appellant argues in his fifth assignment of error that the trial court committed reversible error by allowing this statement into evidence.

▮▮▮ Appellant first contends that the video tape should not have been admitted because the prosecution failed to prove he knowingly and intelligently waived his *Miranda* rights. Appellant specifically argues that his hearing handicap impeded his ability to understand Hutchins when she advised him of his *Miranda* rights. In support of his argument, Appellant directs this Court's attention to *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986), wherein the Supreme Court addressed effective waiver of *Miranda* rights finding that:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*See also Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Further, as Appellant points out, where the admissibility of a statement or confession is challenged, the burden is upon the State to show by a preponderance of the evidence that it was voluntary. *Young v. State*, 670 P.2d 591, 594 (Okl.Cr.1983).

In reviewing this proposition, it is first important to note that prior to Appellant's interview with Hutchins, he read and signed a rights waiver form which explained his *Miranda* rights. Prior to the admission of Appellant's statement into evidence, a hearing was held in accordance with the mandates of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), so that the trial judge could determine whether the statement had been voluntarily given. At this hearing, defense witness Paul Penwright testified that he had been trained to conduct hearing tests to determine hearing loss. He performed a series of hearing tests on Appellant and found him to suffer substantial hearing loss. He also stated that persons who suffer hearing loss sometimes try to pretend they hear although they do not. On cross examination Penwright stated that it is also normal for persons who cannot hear a question to ask the speaker to repeat the question. Penwright acknowledged that he had heard Appellant's video-taped statement and noticed that when Appellant did not hear a question he asked that it be repeated. He also noted that Appellant gave rational and responsive answers to the questions asked which indicated that he had heard and understood the questions.

At this same hearing, Appellant testified on direct examination that he recalled Hutchins talking about his *Miranda* rights but he was unable to understand what she was talking about because he could not hear her well. He did remember, however, that she told him that he had a right to have a lawyer present and that he did not have to talk to her if he did not want to "or something like that."[3] On cross examination Appellant initially confirmed that he remembered Hutchins telling him he could stop talking any time he wanted. Later, he stated he did not remember this. Appellant acknowledged he was willing to talk with Hutchins during the interview until he told her he wanted to stop. He also stated that he heard Hutchins when she repeated her questions.

▮▮▮ Appellant also contends his statement was obtained involuntarily because Hutchins mislead him about what was actually happening at the interview. He directs this Court's attention to portions of the interview where Hutchins told Appellant that she was interested in finding out how the child

**3.** Motion Hearing 32.

was injured so that he could be properly treated, that law enforcement was not out to harm him or 'get' him, and that if he told her the truth she would be able to testify in court that he had done so. It is Appellant's position that these comments made by Hutchins were coercive in that they were designed to overcome his free will and induce him into making a more incriminating statement than he wanted to. We disagree. The comments complained of were not coercive in nature; they did not threaten Appellant or imply promises of benefits or leniency.

The totality of the circumstances surrounding the taking of Appellant's statement, including the characteristics of the accused and the details of the interrogation, support a finding that Appellant knowingly and voluntarily relinquished his *Miranda* rights and that he did not make his statement pursuant to trickery or under coercive circumstances. Accordingly, Appellant's statement was properly admitted at trial.

■ Appellant complains in proposition six that during the first stage of trial the State was improperly allowed to introduce out-of-court statements allegedly made by the child victim which implicated him in other acts of child abuse. The three statements at issue were introduced through Patricia Lowe, the victim's paternal grandmother, who testified to statements made by Alton during his visits to her home months before he died. The first statement occurred when Alton's father, Wayne Lowe, rubbed his head and Alton told him to stop because it hurt. When asked why, Alton replied, "because Johnson grabs me up by the hair and pulls it." [4] On another occasion Alton wet the bed during his visit. When Ms. Lowe asked him

why, he told her that at his house he could not get up and go to the bathroom at night. Alton told her that one night when he did get up, Johnson heard him in the bathroom, came in and grabbed him by the hair, threw him on the floor and kicked him in the stomach. Finally, when asked how Alton would act when it was time for him to go home to his mother and Appellant, Lowe responded that he would cry and say that he didn't like it there. It is Appellant's position that these statements were hearsay which did not fall properly within any of the exceptions to the hearsay rule. He also contends that the admission of these statements violated his right to confrontation under the Sixth Amendment.

■ It is clear that these statements were not admissible nor were they sought to be admitted under any of the firmly established exceptions to the hearsay rule found in 12 O.S.1991, § 2803. Further, they cannot be found to have been admissible under 12 O.S.Supp.1993, § 2803.1, which provides specifically for the admissibility of hearsay statements of children twelve years or younger describing acts of physical or sexual abuse. In order for statements to be admitted under section 2803.1 the proponent of the statement must provide the adverse party with ten days notice of intent to offer the statement and the particulars of the statement. This was not done in the present case. Rather, the record indicates that the State sought to introduce these statements under 12 O.S. 1991, § 2803(24) [5], which is commonly referred to as the residual exception to the hearsay rule.

■ Because of the Confrontation Clause concerns, this Court need not decide

---

4. Trial Transcript, Vol. II, 436.

5. Title 12 O.S.1991, § 2803(24) provides that the following is not excluded by the hearsay rule:
   A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that:
   a. the statement is offered as evidence of a material fact,
   b. the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and

c. the general purpose of this Code and the interests of justice will best be served by admission of the statement into evidence.
A statement shall not be admitted under this exception unless its proponent makes known to the adverse party, sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

whether or not the trial court abused its discretion in allowing the admission of these statements into evidence pursuant to section 2803(24). The Supreme Court reaffirmed in *Idaho v. Wright,* 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638, 651 (1990), that "the [Confrontation] Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause." However, not all evidence otherwise admissible under rules of evidence meets the requirements of the Confrontation Clause. The Supreme Court held that the hearsay statement of an unavailable declarant does not violate the Confrontation Clause if it bears an adequate indicia of reliability. It further stated that, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* 497 U.S. at 815, 110 S.Ct. at 3146, 111 L.Ed.2d at 652. Idaho's residual hearsay exception was found not to be a firmly rooted exception to the hearsay rule for purposes of the Confrontation Clause. *Id.* 497 U.S. at 817, 110 S.Ct. at 3147, 111 L.Ed.2d at 653. The Court held that "particularized guarantees of trustworthiness" are required to be shown from the totality of the circumstances, but "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655.

When evaluating the statements at issue for purposes of the Confrontation Clause, only the circumstances surrounding the making of the statements which render the declarant worthy of belief are proper for consideration. Appellant contends the statements were not sufficiently trustworthy because motive for fabrication existed. He argues that because Alton preferred to stay with the Lowes, he had incentive to fabricate or embellish his experiences with Appellant so the Lowes would not send him home. It is reasonable to find that the statements were not so spontaneous to preclude this possibility, especially the two statements which were made in response to questions about why Alton's head hurt and why he had wet the bed. Accordingly, we find that the admission into evidence of these hearsay statements violated Appellant's right to confrontation.

■ Because this error is constitutional, Appellant's conviction can only stand upon a finding that the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967). In light of the substantial evidence that Appellant inflicted the injuries which caused the child's death, most importantly his own statement, it can be found that the hearsay statements indicating that he had harmed the child on previous occasions did not contribute to the jury's decision to convict Appellant. Accordingly, as to the jury's finding of guilt, the erroneously admitted statements are harmless beyond a reasonable doubt. Whether or not the hearsay statements contributed to the jury's decision to impose the death penalty is less clear. However, because this case must be remanded for resentencing pursuant to error which will be discussed in proposition ten, any error in this regard is thereby remedied and can be avoided at the resentencing proceedings.

■ Several of the State's witnesses testified about prior incidents of abuse committed upon Alton by Appellant and about injuries sustained by Alton. Appellant argues in proposition seven that this testimony was evidence of other crimes or bad acts and it should not have been allowed because he did not receive notice prior to trial that the State intended to introduce it as is required by *Burks v. State,* 594 P.2d 771, 774 (Okl.Cr. 1979); *overruled in part on other grounds, Jones v. State,* 772 P.2d 922, 925 (Okl.Cr. 1989). This Court recognized in *Hiler v. State,* 796 P.2d 346, 348 (Okl.Cr.1990), that the purpose of the notice requirement in *Burks* "is to ensure against surprise on the part of the defense and to allow time for the defense to be heard prior to the information being placed before the jury."

The record supports Appellant's assertion that the prosecutor did not file a formal document the sole purpose of which was to advise the defense of its intent to introduce evidence of other crimes or bad acts. However, the State did, pursuant to required discovery, advise the defense of the witnesses it intended to call upon and the testimony it expected these witnesses to give.[6] It is clear from the record that the defense was not surprised by the testimony concerning other crimes or bad acts. Prior to the admission of this testimony defense counsel objected demonstrating that he knew the nature of the testimony the State sought to elicit from these witnesses. Defense counsel argued that the other crimes evidence was not admissible because no *Burks* notice had been given. Defense counsel went on to explain that he had not objected earlier because if he had, the prosecutor would have given the required notice. Because there was no surprise, as the record clearly reflects, this error *requires no relief.*

◼ Appellant complains in proposition eight of several comments made by the prosecutor which Appellant claims were so unnecessarily prejudicial that they deprived him of a fair trial. Appellant first argues that the prosecutor improperly made comments during the first stage of trial which expressed his own personal opinion to the jury. Three of these comments were met with contemporaneous objection. Two of the objections were sustained and the jury was admonished to disregard them. Any error resulting from these comments was thereby cured. *See Miller v. State,* 751 P.2d 733, 739 (Okl.Cr.1988). The comment to which defense counsel's objection was not sustained can be deemed fair comment on the evidence. Accordingly, the trial court's ruling on this objection was not in error. The other comment which Appellant has characterized as a personal opinion of the prosecutor was not met with objection. As to this comment, all but plain error has been waived. *Freeman v. State,* 876 P.2d 283, 287 (Okl.Cr.), *cert. denied,* —— U.S. ——, 115 S.Ct. 590, 130

L.Ed.2d 503 (1994). This comment was not so egregious as to amount to plain error.

◼ Appellant next complains that the prosecutor made two arguments to the jury during first stage closing argument which were not supported by the evidence. Such comments have been condemned by this Court. *See McArthur v. State,* 862 P.2d 482, 485–86 (Okl.Cr.1993). The record supports Appellant's assertion. However, prior to making these unsupported statements, the prosecutor had advised the jury that what he said in closing argument was not evidence and if he misstated the facts it was not intentional. He asked them to disregard his comments if he did misstate the evidence. These comments were not so inflammatory as to have tainted first stage proceedings.

◼ Finally, Appellant complains of four comments made by the prosecutor during second stage proceedings. Each of these comments were met with contemporaneous objection and three of the objections were sustained. Again, any resulting error was thereby cured. *See Miller v. State,* 751 P.2d at 739. The comment to which the objection was overruled can be found to have been improper. However, because this case is recommended for resentencing said error is of no consequence.

◼ Appellant argues in his ninth proposition that the minimum intent requirement in the statute under which he was convicted is not sufficient to support a sentence of death under the criteria of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7, 9 and 19 of the Oklahoma Constitution. The statute under which Appellant was convicted, 21 O.S.1991, § 701.7(C) provides:

> A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person or who shall willfully cause, procure or permit any of said acts to be done upon the child pursuant to Section 843 of this title.

6. *See* Bill of Particulars In Re Punishment and List of Witnesses; Plaintiff's Pre–Trial Disclosure Statement; and, Amended Bill of Particulars In Re Punishment and List of Witnesses.

As Appellant contends, the intent required for the commission of this act need be no greater than the willful intent to use unreasonable force on a child. Appellant acknowledges that while this specific issue has not before been addressed by the United States Supreme Court, the Supreme Court has made clear that the death penalty is not an appropriate punishment for all persons convicted of first degree murder. Appellant calls this Court's attention to *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, (1982), wherein it was held that a defendant cannot receive a sentence of death for a murder committed by an accomplice unless the defendant knew the killing would take place, knew lethal force would be used, killed, or attempted to kill. Such punishment, for an accomplice, without a greater degree of culpability was held to violate the Eighth Amendment. This ruling was somewhat relaxed by the Supreme Court in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), wherein it held that a defendant who did not actually commit the act which caused death, but who was a major participant in the felony and who had displayed reckless indifference to human life, may be sufficiently culpable to receive the death penalty.

Appellant argues that the language in *Enmund* and *Tison* strongly indicates that one who kills without an intent to do so or to cause major bodily injury, and who does not knowingly act with reckless indifference to human life, is not constitutionally eligible to receive the death penalty. He also maintains that the minimal intent required under section 701.7(C), a willful intent to use unreasonable force on a child, is not always synonymous with reckless indifference to human life. Accordingly, it is his position that a person can be convicted and sentenced to death under 21 O.S.1991, § 701.7(C) and have a less culpable mens rea than that required in *Tison*.

Both *Tison* and *Enmund* concerned situations where an aider and abettor to the murder, a person who had not actually caused the injuries resulting in the victim's death, was sentenced to the death penalty. Appellant is the person who actually killed another, not the person who participated in a felony but who did not actually cause or intend to cause the death of another. We find this distinction to be significant and accordingly, decline to hold that the death qualifying language of *Enmund* and *Tison* should be applied to Appellant or any other person similarly situated. This proposition does not merit relief.

## PROPOSITIONS RELATING TO SECOND STAGE PROCEEDINGS

During second stage proceedings defense counsel sought to call as a mental health expert, Dr. David Hamilton, who had examined Appellant.[7] The record reflects that defense counsel had listed Dr. Hamilton as a second stage witness in Defendant's Witness List and Summary of Testimony. In this document filed May 31, 1994, defense counsel advised that Dr. Hamilton or Dr. JoAnn Omdrovk would be called to testify about the results of a battery of psychological tests performed on Appellant. It further advised that a written report would be supplied to the prosecution as soon as it was made available to the defense. This same information was again supplied in Defendant's Amended Witness List and Summary of Testimony. As of the first day of trial defense counsel had not yet received a written report from Dr. Hamilton. However, before jury selection began on the first day of trial, defense counsel provided the prosecutor with a handwritten note concerning what Dr. Hamilton had told defense counsel during a telephone conversation. In the second stage when defense counsel sought to call Dr. Hamilton as a witness, the prosecutor objected because the defense had not presented him with a written report of the evaluation prior to trial as is required by *Allen v. District Court of Washington County*, 803 P.2d 1164 (Okl.Cr.1990). The trial

---

7. Doctor Hamilton is not a psychologist. He obtained his PhD in Human Services with an emphasis in Counseling Psychology.

court upheld this objection and ruled that Dr. Hamilton would not be allowed to testify.

██ Appellant argues on appeal that the trial court's strict construction of the discovery rules proffered in *Allen v. District Court* prohibited him from putting on mitigating evidence concerning his mental state. Although *Allen* does authorize the preclusion of evidence when a party has failed to comply with the discovery order, this remedy is the most severe of those listed. *See Id.* at 1169. In *Morgan v. District Court of Woodward County,* 831 P.2d 1001, 1005 (Okl.Cr.1992), this Court stated, "it would be inappropriate to exclude defense witnesses from testifying in a death penalty case ... when the actions of defense counsel, and not the defendants, have prevented compliance with the Trial Court's order." Appellant contends that *Morgan* requires the trial court in death cases to impose a lesser remedy than exclusion of defense witnesses when the defendant has not personally contributed to the discovery violation.

The record on appeal was devoid of any information which would have enabled this Court to determine the prejudicial effect, if any, that Appellant suffered by the trial court's preclusion of this expert witness. Accordingly, this Court, in an order handed down on December 8, 1995, remanded the case to the district court for an evidentiary hearing to determine whether the testimony sought to be introduced through Dr. Hamilton could have affected the jury's decision to impose the death penalty. This hearing was held on January 12, 1996. At the evidentiary hearing Dr. Hamilton testified that he had interviewed Appellant on May 11, 1994, for nine hours during which he administered a battery of psychological tests. From these tests, he diagnosed Appellant as having a Dissociative Disorder which he testified could affect Appellant's ability to comprehend the consequences which result from his behavior. Dr. Hamilton testified that in accordance with protocol and pursuant to agreement with defense counsel, he had not prepared a formal report documenting his evaluation of Appellant.

Several other witnesses, including the prosecutor who tried the case, the district court judge who had presided over the trial and Appellant's trial counsel, also testified at the evidentiary hearing. Much of the testimony concerned the discovery violation, with each witnesses recounting his perception of what had happened and who was to blame. Inferences aside, the varying accounts of what happened give this Court no clear picture of who, if anyone, is totally to blame. What is crystal clear, however, is that one person was without fault. That person, the Appellant, unfortunately is the one who was directly and perhaps devastatingly disadvantaged by the imposition of trial court's sanction. Under the circumstances of this case, the district court's conclusion at the end of the evidentiary hearing that the testimony of Dr. Hamilton could have affected the jury's decision to impose the death penalty, and this Court's ruling in *Morgan,* we find it appropriate to remand this case to the district court for resentencing proceedings. Because this remand for resentencing renders moot all other challenges to the second stage proceedings, other propositions raising errors alleged to have occurred during the sentencing stage of trial need not be discussed.

In summary, we **AFFIRM** Appellant's conviction for First Degree Murder and **REVERSE** the sentence **REMANDING** the case to the district court for **RESENTENCING.**

JOHNSON, P.J., and CHAPEL, V.P.J., concur.

LUMPKIN and LANE, JJ., concur in results.

LUMPKIN, Judge, concurring in result.

I agree the case must be reversed, based on the particular facts and circumstances of this case. I do not, however, subscribe to the flat statement of law that in each instance, a case will be reversed because a judge excluded a defendant's evidence from trial because a discovery order was violated. Further, I disagree with the statement the case must be reversed because Appellant himself was not at fault.

I joined in the Court's decision to remand this case for an evidentiary hearing. However, trial counsel should always be aware this

Court has typically held that defense counsel must make an offer of proof as to what excluded evidence would be; otherwise, the complaint that the evidence should have been allowed is waived.

Second, the law requires a defendant to bear the brunt of counsel's errors, unless those errors rise to the level of incompetent counsel. No such allegation is made here. Further, at the evidentiary hearing, the doctor testified he did not prepare a formal report, in part because defense counsel did not want one. Although the record is unclear as to the reason, Appellant must admit that, at least on the surface, this sounds suspiciously as if counsel deliberately failed to comply with the court's discovery order. Were this true, and were counsel's actions not indicative of ineffective counsel, a deliberate disregard of the trial court's order could warrant exclusion of the evidence. Which leads directly to my third point.

Although *Morgan* is valid law in this state, so is *Wilkerson v. District Court*, 839 P.2d 659, 661 (Okl.Cr.1992). There, this Court observed that "flagrant" violations of discovery orders by defense counsel which are "designed to conceal a plan to present fabricated testimony or [which are] willful and motivated by a desire to obtain a tactical advantage" could warrant preclusion of the introduction of that evidence at trial. This opinion makes no mention that *Wilkerson* is being overruled. Therefore, to make broad statements based on *Morgan* which conflict with existing caselaw is simply ill advised.

These concerns aside, the record before us does not show bad faith on defense counsel's part concerning the discovery order. On this point, the evidence is conflicting. The judge who presided over the evidentiary hearing came to the conclusion that it was "possible" the testimony of the doctor could have affected the jury's decision to impose the death penalty. I give such findings great weight. Accordingly, I agree the death penalty here must be vacated and the case remanded for a new sentencing proceeding.

LANE, Judge, concurring in result.

I concur in the results reached by the majority, but I do not agree with the reasoning as it pertains to the sufficiency of the Information. I maintain the position I set forth in *Parker v. State*, 917 P.2d 980, (1996), and I would not alter the rules of pleading in an Information that we followed prior to *Parker*. However, I find the Information sufficient under the old rules. The Information covers all of the elements of the crime charged. It is true that it could be better drafted and include some of the more detailed specifics of the crime. However, this defect must be objected to at the trial level to preserve the issue for appeal. The failure to describe the acts with more detail would be subject to pre-arraignment motions, but it is not plain error that may be addressed for the first time on appeal. *Short v. State*, 634 P.2d 755 (Okl.Cr.1981); *Byrne v. State*, 620 P.2d 1328 (Okl.Cr.1980).