1998 OK CR 3

**Jeffrey David MATTHEWS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–95–687.**

Court of Criminal Appeals of Oklahoma.

Jan. 8, 1998.

Jack Fisher, Edmond, for appellant at trial.

J. Tully McCoy, Purcell, for the State at trial.

Matthew D. Haire, Oklahoma Indigent Defense System, Norman, for appellant on appeal.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for appellee on appeal.

### *OPINION*

STRUBHAR, Vice Presiding Judge:

¶ 1 Appellant, Jeffrey David Matthews, was charged with First Degree Murder (Count I), Assault and Battery With a Deadly Weapon (Count II), and Conspiracy to Commit a Felony (Count III), in the District Court of McClain County, Case No. CF–94–18. He was also charged in a separate Information with Unauthorized Use of a Motor Vehicle (Count IV), in the District Court of McClain County, Case No. CF–94–19. As to the First Degree Murder charge, the State filed a Bill of Particulars alleging four aggravating circumstances: (1) that Appellant created a great risk of death to more than one person, (2) that the murder was committed for the purpose of avoiding lawful arrest, (3) that the murder was committed while Appellant was serving a sentence of imprisonment, and (4) that Appellant constituted a continuing threat to society. Appellant filed a Motion for a Change of Venue which was granted. The above mentioned cases were consolidated and tried in the District Court of Cleveland County, Case No. CF–95–183, before the Honorable Tom A. Lucas. At the conclusion of the trial, the jury found Appellant guilty of all crimes charged. The jury

assessed punishment at death on Count I [1] and forty-five years imprisonment on each of Counts II, III and IV. The trial court sentenced Appellant in accordance with the jury's recommendation. It is from this Judgment and Sentence that Appellant has perfected his appeal to this Court.[2]

## FACTS

¶ 2 In the early morning hours of January 27, 1994, Minnie Short was awakened by a noise in the living room of her home located in a rural area east of Rosedale, Oklahoma. She thought that it was around 6:00 a.m. and decided to get up for the day. She got out of bed and went into the living room where she was attacked from behind by someone with a knife. As she struggled with her attacker he cut her throat. Her husband Earl came into the living room and was shot in the back of the head by another person. Earl fell to the floor beside Minnie. She was told to lie still and was asked several times where the money was hidden. After ransacking the house for almost two hours the two men left with approximately $500.00, a .32 caliber Smith & Wesson, and the Shorts' brown pickup. After the men were gone, Minnie Short dressed and went to the road to try to get help. A passing ambulance saw her and stopped. She told the paramedics that she had been cut and her husband had been shot. They bandaged the wound on her neck, which had stopped bleeding and was determined to be non life-threatening. The paramedics then went to the house where they determined that Earl Short was dead.

¶ 3 When the police talked with Minnie Short she could not describe her attacker or the man who shot her husband. She recalled, however, that her attacker wore a dark jacket with a large circular design and the other man wore tan loose-fitting clothes. She also remembered that the man who attacked her had made a telephone call from her kitchen shortly before they left. When the police traced this phone call they found that it had been made at 8:16 a.m. to Bill Guinn in Oklahoma City. Mr. Guinn confirmed that the call had been made by his nephew, Tracy Dyer, who had called to say that he would be late coming to work that morning because he was having trouble with his truck. At around 10:00 p.m. on January 27 the police went to Dyer's trailer where they found Tracy Dyer and his uncle, Harry Wayne Clary, who was visiting from Madill. Both Dyer and Clary were taken to the sheriff's office for questioning.

¶ 4 Although Dyer initially denied any involvement in the crime, he became more forthcoming when confronted with the telephone call which placed him in the Shorts' home. In his first statement Dyer said that he and Appellant had gone to the Shorts' house to look for money that they believed to be hidden there. Dyer blamed Appellant for the murder of Earl Short and the attack on Minnie Short but he admitted to looking for money. Dyer was arrested.

¶ 5 On January 28, 1994, a warrant was procured for Appellant's arrest. After his arrest on that same date, Appellant was interrogated by OSBI agents. A search warrant for Appellant's home was issued and executed soon after his arrest. Police seized a pair of brown coveralls, three $100.00 bills found in the freezer, some items of clothing and a prescription pill bottle for Xanax made out to Minnie Short found on a nightstand. The backyard was searched but nothing was found there. Later, in June of 1994, one of Appellant's neighbors found a .32 Smith & Wesson revolver buried in a field situated directly behind Appellant's house. This gun was identified as the gun taken from the Shorts' home by their attackers. The police went to the field with metal detectors and found another buried gun, a .45 Ruger pistol,

---

1. As to Count I, First Degree Murder, the jury found the existence of three of the alleged aggravating circumstances: (1) that Appellant created a great risk of death to more than one person, (2) that the murder was committed while Appellant was serving a sentence of imprisonment, and (3) that Appellant constituted a continuing threat to society.

2. Appellant's Petition in Error was filed in this Court on December 20, 1995. His Brief-in-Chief was filed on September 3, 1996, and the State's Response Brief was filed on January 2, 1997. The case was submitted to this Court on January 3, 1997, and oral argument was heard on this case on April 2, 1997.

which was later determined to have been the gun used to kill Earl Short.

## PROPOSITIONS

¶ 6 Although Appellant raised twenty-eight propositions of error in his Brief–in–Chief and Supplemental Brief, we address in this opinion only those propositions relating to the first stage of trial which require reversal and which raise errors to avoid on retrial.

¶ 7 Appellant was arrested in his home at approximately 2:30 a.m. on January 28, 1994. He filed a motion to quash the arrest and suppress all evidence obtained pursuant to it, claiming his arrest was illegal because the arrest warrant executed by the authorities was not based upon probable cause. A hearing was held on this motion in March of 1996. At this hearing it was established that at approximately 2:00 a.m. on January 28, 1994, OSBI Agent Dale Sparks went to the home of Judge Noah Ewing in order to secure a warrant for Appellant's arrest. Instead of taking an affidavit *per se*, Sparks showed Judge Ewing an Information charging Appellant with the crime of Unauthorized Use of a Motor Vehicle.[3] Judge Ewing testified at the suppression hearing that the Information was in an affidavit form. It thus served the dual purpose of being both an Information and probable cause affidavit. Judge Ewing testified that he placed Sparks under oath and asked him if the Information was true. Sparks responded that it was and elaborated to some degree on the facts stated therein. However, neither Judge Ewing nor Agent Sparks could remember or articulate any specific facts discussed other than those mentioned in the Information. Agent Sparks admitted at the hearing that the Information

set forth no facts which would indicate why he believed Appellant had committed the crime alleged. Nor did Judge Ewing recall any other documents being presented to him by Sparks. Agent Sparks signed the Information as the affiant/complaining witness. Based upon the Information and what Agent Sparks told him under oath, Judge Ewing found probable cause and an arrest warrant was issued. At the close of the hearing on the motion to quash, the trial court denied Appellant's motion.

¶ 8 Appellant argues on appeal that this ruling was in error as there was no probable cause affidavit presented to Judge Ewing to support the issuance of the arrest warrant. This allegation while technically correct, is not so as a matter of practicality. As mentioned above, Judge Ewing testified that the Information presented to him served as an affidavit. It was couched in terms of an affidavit and sworn to by Agent Sparks, who acted as the affiant. There is nothing *per se* objectionable about the use of such a document to establish probable cause. Rather, the problem here, as Appellant also notes, is that there were no facts alleged in the Information indicating how Appellant was connected to the crime charged.

¶ 9 A similar situation was addressed by the United States Supreme Court in *Whiteley v. Warden of Wyoming State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). *Whiteley* arose when a county sheriff who was investigating the burglaries of certain business establishments, acting on a tip, signed a complaint charging the defendant and another with breaking and entering.[4] Based upon this complaint, the justice

---

3. The Information contained the following language:

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA, J. TULLY McCOY, District Attorney, comes into Court and states upon this Affidavit of the undersigned Affiant that the above-named Defendant on or about the 27th day of January, 1994, at Rt. 1, Byars, McClain County, State of Oklahoma, while acting in concert and together with Tracy Lynn Dyer
did unlawfully, wilfully [sic] and feloniously, not being entitled to its possession, take, use or drive a certain motor vehicle, to-wit: a 1981 Chevrolet Pickup Truck, 1994 Oklahoma tag

number GVS 269, belonging to and without the consent of Otis and Minnie Short, the owner thereof, with the unlawful and felonious intent on the part of said defendant, then and there to deprive said owner temporarily or permanently of the possession of said vehicle, contrary to the form of the Statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma. (O.R.1092)

4. The complaint contained the following language:

I, C.W. Ogburn, do solemnly swear that on or about the 23 day of November, A.D. 1964, in

of the peace issued an arrest warrant. After the warrant was issued, the sheriff put out a state bulletin on the radio advising that an arrest warrant had been issued for these persons. In reliance upon this bulletin, a Laramie patrolman arrested Whiteley and his companion. Whiteley was tried for breaking and entering and evidence seized pursuant to his arrest was used against him at trial.

¶ 10 Whiteley claimed that his arrest was illegal and therefore, the evidence seized should have been suppressed. The Supreme Court first noted that "[t]he decisions of this Court concerning Fourth Amendment probable-cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Id.* 401 U.S. at 564, 91 S.Ct. at 1035. In *Whiteley* the parties had stipulated to the record which revealed that the arrest warrant was supported solely by the sheriff's complaint which consisted of nothing more than the conclusion that the individuals named had perpetrated the offense described. Although the actual basis for the Sheriff's conclusion was the informer's tip, that fact and all other operative facts were omitted from the complaint. Accordingly, the Court held "that document alone could not support the independent judgment of a disinterested magistrate." *Id.* 401 U.S. at 565, 91 S.Ct. at 1035. Further, the Court noted that even if the affiant had possessed sufficient information to support a finding of probable cause, testimony concerning this information could not rehabilitate an insufficient affidavit if this information had not been passed on to the magistrate. The Court stated "[a] contrary rule would, of course, render the requirements of the Fourth Amendment meaningless." *Id.* 401 U.S. at 565 n. 8, 91 S.Ct. at 1035 n. 8. This Court, in *Mosier v. State,* 671 P.2d 62, 64 (Okl.Cr.1983), ruled similarly finding that an arrest warrant based upon the bald allegations of a preliminary Information was insufficient to allow an independent finding of probable cause.

¶ 11 In light of these prior cases from both the United States Supreme Court and this Court, we find the Information in the present case did not provide sufficient probable cause upon which to base the issuance of the arrest warrant. We note that Agent Sparks may have possessed additional information which would have provided sufficient probable cause for the issuance of the arrest warrant. However, on the record before this Court, we cannot, without speculation, find that sufficient additional information was imparted to Judge Ewing to support the issuance of the warrant. Accordingly, we find that Appellant's arrest was illegal because the arrest warrant was not based upon a proper finding of probable cause.[5]

¶ 12 Appellant next contends that because his arrest was unlawful, his postarrest statements should have been suppressed. Statements made by an accused subsequent to an illegal arrest are potentially fruit of the poisonous tree and should be suppressed unless the making of such statements was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). The Supreme Court in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), set forth several factors to be considered when determining whether the statements were obtained

---

the County of Carbon and State of Wyoming, the said Harold Whiteley and Jack Daley, defendants did then and there unlawfully break and enter a locked and sealed building [describing the location and ownership of the building].
*Id.* 401 U.S. at 563, 91 S.Ct. at 1034 (brackets in original).

5. It is important to note that in the absence of a valid arrest warrant the police were without authority to burst into Appellant's home in the middle of the night and arrest him for Unauthorized Use of a Motor Vehicle. While it is axiomatic that under certain circumstances police can make warrantless arrests, this was not such a situation. Absent exigent circumstances, the Fourth Amendment prohibits warrantless entry into an individual's home. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). No exigent circumstances were presented for the routine felony arrest effected in the present case.

through the exploitation of the illegal arrest or whether they can be considered to have been voluntarily made. These factors include (1) the giving of *Miranda* warnings, (2) the "temporal proximity" of the arrest and the statements, (3) the presence of "intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." *Id.* 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The burden of showing that the statements at issue were voluntary and therefore admissible lies with the State. *Id.*

■ ¶ 13 In the present case, Appellant was arrested at around 2:30 a.m. when law enforcement officials kicked down the door to his house. He was hit on the head with a flashlight during a scuffle and stood in his shorts, bleeding from the head in his living room by the open doorway while officers conducted a security sweep of his house and allowed his girlfriend to dress. Appellant was not allowed to dress, but was taken out to a police car and transported to the hospital where his head was sutured. After this, he was taken to the police station where he was read his *Miranda* rights and interrogated first by Dale Sparks. Because Agent Sparks found Appellant to be belligerent and uncooperative, he asked OSBI Agent Lydia Williams to resume questioning Appellant. Appellant's statement was made to Agent Williams.[6]

¶ 14 Appellant was interrogated and made his statement as soon after the illegal arrest as officials could question him. Al-

though Appellant was apprised of his *Miranda* rights and signed a document acknowledging this, it is clear from the record that he was hesitant to talk. There is nothing in this course of events which can be found to have purged the taint of Appellant's unlawful arrest—no intervening circumstances which would allow this Court to find that his statement was not a product of his illegal arrest.

■ ¶ 15 Having found then that Appellant was illegally arrested and his statement tainted by the illegal arrest, we must next determine whether this error requires relief. Because this error is of constitutional magnitude, Appellant's conviction can only stand upon a finding that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967). *See also Wisdom v. State*, 918 P.2d 384, 393 (Okl.Cr.1996). Further, it is the State's duty to demonstrate beyond a reasonable doubt that the illegally obtained statement did not contribute to the conviction. *Pickens v. State*, 885 P.2d 678, 682 (Okl.Cr.1994), *overruled on other grounds, Parker v. State*, 917 P.2d 980, 986 (Okl.Cr.1996).

■ ¶ 16 Appellant's conviction in this case was secured after the introduction of the following evidence (1) the testimony of several witnesses including Dyer's testimony of Appellant's involvement in the crimes, (2) Appellant's illegally obtained statement and his testimony at trial[7], and, (3) physical evi-

---

**6.** Agent Williams testified that Appellant told her he was home the night before the murder. Early that evening Tracy had come by and the two of them worked on Tracy's pickup for a few minutes. Then Tracy left, and Appellant went to sleep inside his own pickup. At about 4:00 a.m. Tracy came back with another person named John who gave Appellant $300.00 and asked him to buy some drugs for him. The three drove to a residence near Byars to buy drugs but no one was home. On their way back to Purcell, about two miles east of Rosedale Tracy's pickup stalled. Tracy and John got out and started walking and Appellant fell asleep. A short time later Tracy and John drove up in a brown pickup belonging to the Shorts. They used the Shorts' pickup to jump start Tracy's pickup. Then Tracy and John got back inside Tracy's pickup and Tracy drove the Shorts' pickup. He noted that they were seen by a man in a white pickup and by a man in a red pickup. Eventually, he left the Shorts'

pickup behind some tank batteries and they drove Tracy's pickup back to Purcell. When they got back to Tracy's trailer John walked off and Appellant went with Tracy into the trailer. He eventually went home. Appellant said that the $300.00 found in his freezer was the money he was supposed to use to make the drug buy. He never admitted to having been inside the Shorts' home. (Trial Transcript VI, 1247–54).

**7.** Before Appellant testified at trial, defense counsel stated on the record that Appellant was testifying "only because the [trial] court ha[d] overruled his motion to suppress that [sic] statement that he gave to Lydia Williams on the ground that it was involuntary, it was a result of an illegal seizure, and resulted in an illegal arrest." (Trial Transcript IX, 2051) Defense counsel stated on the record that Appellant testified at trial because he felt he needed to tell his version of the interview with Williams.

dence found at Appellant's house. Outside of Dyer's testimony, the greater bulk of the evidence presented against Appellant at trial was circumstantial. Although Appellant did not admit in his statement to having been involved in the commission of the crimes, he did admit to having been in the Shorts' pick-up near their house on the morning the crimes occurred. His testimony at trial was also damning as his attempt to explain his prior statement only succeeded in making him seem inconsistent and unbelievable. We cannot find that the admission of this illegally obtained statement was harmless beyond a reasonable doubt. Indeed, the admission of Appellant's statement can be found to have contributed to his conviction on each of the counts charged and accordingly, all counts against Appellant must be reversed and remanded for a new trial.

¶ 17 We also address Appellant's sixth proposition alleging error in Tracy Dyer's testimony. Prior to Appellant's trial Dyer had entered a plea of guilty and received a sentence of life with the possibility of parole. During the State's examination of Dyer at Appellant's trial, Dyer was asked about the agreement he had made with the State in order to receive the State's recommendation that he be sentenced to life imprisonment. Dyer testified that he had agreed to tell the truth and had also agreed to take a polygraph. Defense counsel objected to Dyer's comment about the polygraph and requested a mistrial. The trial court denied this request finding that it was inadvertent and not prejudicial. The trial court also offered to admonish the jury to disregard the comment. Defense counsel declined this offer stating that it would be more harmful than beneficial. The State's examination of Dyer continued and the polygraph test was not mentioned again.

¶ 18 Appellant correctly advises that this Court has held the results of polygraph tests are not admissible for any purpose. *See* *Paxton v. State,* 867 P.2d 1309, 1323 (Okl.Cr. 1993), *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994). The Tenth Circuit Court of Appeals has also held that evidence that a witness has taken a polygraph test is inadmissible. *See U.S. v.*

*Soundingsides,* 820 F.2d 1232, 1241–42 (10th Cir.1987). Accordingly, we find that the jury should not have heard testimony indicating that Dyer had taken a polygraph test.

¶ 19 Finally we address Appellant's argument in his thirteenth proposition, which concerns the requirement that accomplice testimony be corroborated. Bryan Curry was charged with the December 1993 burglary of the Shorts' cellar. Although Appellant was not also charged with this crime, Curry testified at trial that he, Tracy Dyer and Appellant committed the burglary together. Defense counsel requested the jury be instructed that Curry was an accomplice and as such his testimony concerning Appellant's participation in the 1993 burglary required corroboration. The trial court declined to so instruct. Appellant argues that this ruling was in error. Although Appellant acknowledges that this Court has not previously addressed the applicability of these instructions to witnesses who meet the definition of an accomplice with regard to uncharged crimes, he urges this Court to consider the issue now.

¶ 20 This Court has long held that, "[t]he test used to determine whether a witness is an accomplice is whether he or she could be indicted for the offense for which the accused is being tried." *Carter v. State,* 879 P.2d 1234, 1246 (Okl.Cr.1994), *cert. denied,* 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995). When the crime at issue is not the one for which the defendant is being tried, the witness and the defendant are still accomplices if both could be indicted for the offense. This is regardless of whether either, or both, have been charged with the other offense. A witness who was an accomplice in a crime for which the defendant is not currently being tried may have as compelling a reason for testifying about the defendant's involvement in this other crime as would a witness who was an accomplice in the same crime for which the defendant is currently being tried. It makes no sense to deny a defendant instructions requiring that the accomplice's testimony be corroborated. Accordingly, we find that Appellant's requested instructions regarding accomplice testimony should have been given.

¶ 21   In light of the foregoing discussion, Appellant's Judgment and Sentence is **RE-VERSED** and **REMANDED** to the District Court for a **NEW TRIAL**.

CHAPEL, P.J., and LUMPKIN, LANE and JOHNSON, JJ., concur.

