1998 OK CR 77

**Darwin Demond BROWN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F 97–493.**

Court of Criminal Appeals of Oklahoma.

Dec. 31, 1998.

Rehearing Denied Feb. 22, 1999.

Allen M. Smallwood, Tulsa, Oklahoma, for defendant at trial.

William LaFortune, District Attorney, Brett Swab, Assistant District Attorney, Tulsa, Oklahoma, for the state at trial.

Johnie O'Neal, Tulsa, Oklahoma, for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, Oklahoma, for appellee on appeal.

*OPINION*

LANE, Judge.

¶ 1 Appellant, Darwin Demond Brown, was charged conjointly with three codefendants [1] with the crimes of, count one, first degree malice murder and, in the alternative, first degree felony murder, 21 O.S.1991, § 701.7(A) & (B) and, count two, robbery with a dangerous weapon, 21 O.S.1991, § 801 in the District Court of Tulsa County, Case No. CF–95–1024. The State filed a Bill of Particulars alleging three aggravating circumstances. A jury trial was held before the Honorable E.R. "Ned" Turnbull, District Judge. The jury found Brown guilty of first degree murder and robbery with a dangerous weapon. After the punishment stage, the jury found the existence of all three aggravating circumstances: the murder was especially heinous, atrocious or cruel, the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(4), (5) & (7).

## I. FACTS

¶ 2 Brown's codefendant Michael Wilson was employed at the QuikTrip convenience store located at 215 North Garnett Road in Tulsa, Oklahoma, where Richard Yost also worked. Brown and the codefendants came into the store during the early morning hours of February 26 and waited for the most opportune time to accost Yost. The QuikTrip surveillance camera captured the events as they unfolded. The video of the events is quite telling.

¶ 3 Yost was cleaning the windows on the coolers with all of the defendants surrounding him. As Yost was walking near a passage-way to the back room, all four defendants attacked him and dragged him to the

---

1. Codefendants were Billy Don Alverson, Michael Lee Wilson and Richard Harjo. Wilson was tried conjointly with Brown and appeals under Oklahoma Court of Criminal Appeals case number F 97–491. Alverson appeals under case number F–97–1024. Harjo appeals under case number F 97–1054. Wilson and Alverson were also sentenced to death. Harjo was sentenced to life without the possibility of parole.

back room. One of the defendants, Billy Alverson, came back out and picked up some items that were knocked from the shelves. He also kept watch for customers. A few moments later, Alverson and Richard Harjo walked out the front door of the store. While they were going out, Yost was yelling and screaming for help, possibly thinking that a customer had entered the store. Alverson and Harjo re-entered the store with Harjo carrying a black aluminum baseball bat. He carried the bat to where Yost had been taken. The surveillance camera picked up the sounds of the bat striking Yost. Circumstantial evidence showed that the baseball bat struck the handcuffs on Yost's wrists which Yost was holding above his head to ward off the blows. As the blows were being struck, Wilson walked from the back room, checked his hands, put on a QuikTrip jacket, got behind the counter and tried to move the safe. While Wilson was behind the counter, several customers came in. Wilson greeted them with a friendly greeting, sold them merchandise, then said "thank you, come again" or "have a nice day."

¶ 4 All this time Wilson continued to try and pull the safe from underneath the counter. He took money from the cash drawer and pulled money out of the currency change machine. At some point after this, Wilson left the counter area and the video went blank as the video was taken from the recorder. Brown was never seen exiting the back room between the times Yost was dragged into the room until the video recorder was stopped. The defendants then loaded two safes into Wilson's car using a dolly from QuikTrip.

¶ 5 Yost's body was discovered by customer Larry Wiseman at about 6:00 a.m. Yost was laying on the floor in a pool of blood, milk and beer. Yost's ankles were taped together with duct tape. One handcuff was found near Yost's body. The other cuff was missing from the scene. Detectives learned that Wilson was at the store between the hours of 4:00 a.m. and 6:00 a.m.

¶ 6 Wilson failed to show up for work at the scheduled time of 3:00 p.m. on the same day. Officer Allen set up surveillance on Wilson's house, and at about 4:00 p.m. he

spotted Wilson get into a gray vehicle. The vehicle was stopped. All four defendants were taken into custody. A large number of five dollar bills was recovered from Harjo at the site of the stop. Later, at the police station, money was recovered from all of the defendants except Wilson.

¶ 7 Officers searched Alverson's place of abode where they discovered the drop safe, the dolly, QuikTrip glass cleaner, money tubes and the store surveillance videotape. A search was conducted of Wilson's house but nothing of value was discovered. The next day Wilson's mother called Officer Makinson to come to her house. Once there, the detectives found several items of evidence on the front porch, including the baseball bat, a bloody QuikTrip jacket with Yost's name on it, Wilson's Nike jacket matching the one worn in the store video and the other cuff of the set of handcuffs.

¶ 8 Brown raises eighteen propositions of error in his appeal. These propositions will be addressed as they arose at trial.

## II. DUAL JURY ISSUES

¶ 9 In proposition two, Brown raises several issues concerning the use of dual juries in this case. Although he was tried conjointly with codefendant Wilson, each defendant had a separate jury deciding their fate.

¶ 10 In *Cohee v. State*, 1997 OK CR 30, ¶ 2, 942 P.2d 211, 213, a majority of this Court set forth Guidelines Governing Juries in Criminal Trials which included, in Guideline 2, approval of the use of dual juries in cases where codefendants are charged. Very little guidance was given to trial courts in the implementation of this procedure except for the provision that:

> Both juries will be seated in the jury box and the evidence pertaining to both defendants will be presented to both juries simultaneously. Evidence admissible as to one co-defendant shall be presented to that defendant's jury only.

*Cohee*, 942 P.2d at 213. We now have before us Brown's claim that the dual jury system is not authorized under Oklahoma law and the

procedure violates a defendant's constitutional rights. We previously ruled, in an "Extraordinary Writ" action by Brown, that the trial court has the discretion to implement a dual jury procedure because Oklahoma law does not prohibit such a procedure.[2] Under the theory of collateral estoppel (issue preclusion), "once a court has decided an issue of fact or law necessary to its judgment, that issue may not be re-litigated between the same parties or their privies in a suit on a different cause of action." *Wilson v. Kane,* 1993 OK 65, n. 23, 852 P.2d 717, 727, n. 23.[3] Therefore, the principle of collateral estoppel prevents Brown from raising the issue of whether the dual jury procedure is authorized in Oklahoma. However, Brown's arguments regarding the dual jury procedure's effect on his rights are properly before us.

¶ 11 We first note that jurisdictions which have approved the use of a dual jury system or a multiple jury process require a defendant to show actual prejudice from the use of this novel approach to multiple defendant trials.[4] We find this approach comports with Oklahoma law. The use of the multiple jury process is constitutional, and a conviction had with the use of the multiple jury system will be upheld absent a showing of specific prejudice.

¶ 12 Brown claims that the dual jury system violates his right to free, unfettered cross-examination because it has a chilling effect on effective cross-examination. He claims that this problem was magnified when the trial court instructed defense counsel that it is the responsibility of attorneys for the State and defense to advise the Court of testimony which would make it necessary to have the juries separated. The trial court told the attorneys that they would have to work a little harder and that the trial court did not anticipate that any of the attorneys would purposely taint the proceedings in front of the jury.

¶ 13 Brown asserts that counsel could either pursue evidence prejudicial to the codefendant and cause a prejudicial spectacle of removing one jury during the course of the trial; prejudicial because removal would place, in the removed jurors' minds, the idea that something bad was about to be said about their respective defendant.

¶ 14 We fail to see the quandary here. The better course is to remove the jury which may be subject to information that they would otherwise be prohibited from hearing. The jury should be instructed that they are not to speculate about what went on in their absence and not to hold it against the defendant for whose fate they were deciding. We believe that the trial court's instructions to the juries sufficiently protected Brown from any prejudice arising from removal of his jury.

¶ 15 The trial court, in its initial instructions, told both juries that they would be removed from the court room when evidence was presented that did not pertain to their particular defendant. The trial court asked the juries collectively if they could assure the court that they would "not attempt to draw any inference, or come to any conclusions, or guess at what evidence may be presented or is being presented at the time when you were

---

**2.** Brown and two of his codefendants filed Petitions for Extraordinary Relief prior to the commencement of this trial asking that the trial court be prohibited from using a dual jury system. We denied the Petitions holding that Oklahoma law did not preclude the trial court from exercising his discretion and impaneling dual juries. *Harjo et al. v. Turnbull,* Order Denying Petitions for Extraordinary Relief, Nos. P 96–1258, P 96–1266, P 96–1278 (Okl.Cr. January 14, 1997) (not for publication).

**3.** For a discussion of the differences between collateral estoppel and res judicata see *Miller v. Miller,* 1998 OK 24, ¶¶ 22–26, 956 P.2d 887, 896–97.

**4.** *People v. Hana,* 447 Mich. 325, 524 N.W.2d 682, 693 (Mich.1994); *Ewish v. State,* 110 Nev. 221, 871 P.2d 306, 313 (1994), *reversed on other grounds,* 111 Nev. 1365, 904 P.2d 1038; *People v. Cummings,* 4 Cal.4th 1233, 18 Cal.Rptr.2d 796, 850 P.2d 1, 35 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994); *State v. Bowman,* 588 A.2d 728, 734 (Me.1991); *State v. Beam,* 109 Idaho 616, 710 P.2d 526, 534 (1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986), *sentence vacated on other grounds in Beam v. Paskett,* 3 F.3d 1301, 1304 (9th Cir.1993), *cert. denied,* 511 U.S. 1060, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994); *United States v. Lewis,* 716 F.2d 16, 19 (D.C.Cir.1983), *cert. denied,* 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1983).

outside of the courtroom." The juries collectively answered in the affirmative.

¶ 16 We believe that the trial court's instructions to the juries correctly informed them of their duty. We have not found nor has Brown presented evidence that the jurors did not follow this admonishment.

■ ¶ 17 Brown claims that the dual jury system creates a conflict of interest for defense counsel because he must not only represent his client, but must also strive to protect the codefendant during his presentation of witnesses or cross-examination when both juries are present. Brown cites *Holloway v. Arkansas*, 435 U.S. 475, 488–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426 (1978), for the proposition that when a conflict of interest is present, prejudice is presumed.

¶ 18 In *Holloway*, counsel was required to represent three different codefendants who had conflicting interests. Trial counsel, as an officer of the court, had filed pre-trial motions advising the trial court of a possible conflict of interest and requested separate counsel. This motion was denied. The Court in *Holloway* determined that when trial counsel, as an officer of the court, claims that a possible conflict of interest will occur because of joint representation, the failure to take adequate steps to resolve the conflict constitutes reversible error. *Holloway*, 435 U.S. at 486–87, 98 S.Ct. at 1179–80.

¶ 19 In this case, each defendant had separate counsel. Therefore, counsel was not faced with the problems occurring in *Holloway*. The only obligation Brown's counsel had to the codefendant was to inform the judge when his questions would lead to answers which would not be admissible in the trial of the codefendant. If objectionable questions and answers were presented, it was the responsibility of the codefendant's attorney to raise an objection. At that point it was the trial court's responsibility to determine whether the questioning was prejudicial to the codefendant. We do not believe that the responsibility placed upon trial counsel chilled cross-examination in this case. Furthermore, Brown does not identify specific instances where his counsel was acting under

an actual conflict of interest. Accordingly we find no error in the use of the dual jury system in this case.

## III. VOIR DIRE ISSUES

■ ¶ 20 Brown claims, in proposition seven, that jurors were excused in violation of the test found in *Wainwright v. Witt*.[5] The proper inquiry is whether a juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852. Brown complains that in this case the trial court improperly asked the jurors if they could impose the death penalty, regardless of their beliefs.

¶ 21 The trial courts voir dire went something like this, for example:

THE COURT: ... Mr. Monroe, ... if convicted, ... it is the duty of the jury to impose punishment.... [The punishment options] are, number one, life in the penitentiary; number two, life in the penitentiary without the possibility of parole, and number three, the death penalty. Mr. Monroe, are you opposed to or in favor of the death penalty?

MR. MONROE: I am opposed to the death penalty.

THE COURT: ... Would your opposition to the death penalty prevent or substantially impair your ability to find the defendant guilty if the law and the evidence so warrants, because the death penalty could be imposed?

MR. MONROE: No.

THE COURT: ... If this case should reach the penalty phase, would you automatically vote against the death penalty, regardless of the evidence and the law, that is presented to you while this Court is in session?

MR. MONROE: Yes, I would, sir.

¶ 22 Thereupon, the juror would be excused for cause without any further inquiry. Other than Mr. Monroe, Brown complains about the removal, for cause, of potential jurors Borens, Sicks, Akers, LaPage and

5. 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Ross. Jurors Akers, LaPage and Ross answered the questions just as Monroe answered, and they too were excused for cause.

¶ 23 Juror Borens first stated that she was opposed to the death penalty but would not automatically vote against it. On further voir dire from the State and the trial court, Borens was asked if she would consider the death penalty. She stated that she would not consider the death penalty. Juror Sicks initially indicated that she was opposed to the death penalty and she "would have to vote not in favor of the death penalty." Under further inquiry by the trial court wherein the trial court asked, "you would not consider all three of the penalty options, or you would consider all three of the penalty options?" Sicks said "I do not think I could consider the death penalty." The trial court further inquired by asking "Are you telling me that in no circumstances could you impose the death penalty?" Sicks responded, "it would be very hard. I don't know that I could morally do that." In an attempt to clarify Sicks position, the trial court asked, "Are you telling me that under no circumstances could you impose the death penalty.? ... [I]f we came to the sentencing stage you would have three options. Are you telling me you would not consider the third option?" Sicks replied, "I would not consider it." Sicks was then excused.

¶ 24 Of all the jurors Brown complains about, only Sicks was asked specifically if she would impose the death penalty. Even in voir dire the trial court corrected itself and correctly asked if she could consider the death penalty.

¶ 25 We have held:

[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Allen v. State,* 1994 OK CR 13, ¶ 23, 871 P.2d 79, 90–91 (citations omitted). The potential jurors Brown complains were improperly re-

moved clearly stated that they would not consider the death penalty or would automatically vote against the death penalty. Although the trial court's voir dire was not a model of perfection, the jurors were properly removed.

■ ¶ 26 The better approach in examining potential jurors regarding the punishments in a capital murder case is to use the voir dire questions and order set forth in OUJI–CR 2d, 1–5 (1996). However, we find that the manner in which the trial court conducted voir dire in this case was not error. There is nothing to indicate that the jury was bent on delivering the death penalty nor is there anything to indicate that otherwise qualified jurors, who could put personal feelings aside, were excluded.

■ ¶ 27 Brown further complains that he was not allowed to rehabilitate these jurors. The trial court is not required to allow the parties to rehabilitate potential jurors. *Duvall v. State,* 1991 OK CR 64, ¶ 25, 825 P.2d 621, 631, *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). Therefore, there was no error in the manner in which the trial court conducted this portion of voir dire in this case.

■ ¶ 28 In proposition six Brown claims that two jurors were excused by the State in violation of his constitutional rights as interpreted by *Batson v. Kentucky.*[6] Brown claims that these two jurors, Busby and Sims, were excused because they were the same minority race as he was. The State offered race neutral reasons for excluding both jurors. The State asserted that they were excusing Busby because she was opposed to the death penalty, she gave inconsistent answers and said she couldn't be fair to the State. Facts also reveal that Busby was the niece of the Tulsa Police Department's Deputy Chief. Both her brother and her cousin were police officers. Busby's second cousin was murdered and her sister-in-law's brother was beaten with a bat. The State asserted that juror Sims was sleeping during the voir dire process. The trial court also took notice that Sims had been falling asleep during voir dire and questioned her,

6. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

*in camera,* regarding her reasons for sleeping.

¶ 29 "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Brown has not persuaded us that the trial court abused its discretion in finding that the State's race neutral reasons were legitimate and did not deny equal protection. *Id.; Cleary v. State,* 1997 OK CR 35, ¶ 6, 942 P.2d 736, 742–43. Accordingly, we find no error in this proposition.

¶ 30 In proposition eight, Brown asserts that he was prejudiced by comments made by a juror during voir dire. This juror's friend lived with codefendant Wilson's ex-girlfriend, and this juror apparently heard his friend and Wilson's ex-girlfriend talking about what Wilson had said to his ex-girlfriend about the crime. This juror's friend had also told him what was "going on." Brown claims this was a violation of *Bruton v. United States.*[7] "An accused's right to confront the witnesses against him is violated when the out-of-court admissions of non-testifying codefendants which implicate the defendant are introduced at trial." *Johnson v. State,* 1995 OK CR 62, *on rehearing,* 911 P.2d 918, 932, *citing Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622.

¶ 31 This jurors' comments can hardly be called an interjection of Wilson's extra-judicial confession. In fact, it is practically impossible to call the colloquy a confession at all, except for the fact that it shows Wilson had personal knowledge of the crime. However, there was no information divulged which would have, in any way, implicated Brown. Therefore, this proposition must fail.

### IV. FIRST STAGE ISSUES

#### A.

¶ 32 In proposition one, Brown claims that certain evidence obtained as a result of his "arrest" should have been suppressed because the arrest was made without probable cause. Brown specifically complains about the introduction of his statements to officer Don Bell. The statements were introduced during the first stage of trial over the contemporaneous objection by Brown.[8]

¶ 33 Brown was a passenger in a vehicle occupied by all of the codefendants. The vehicle was stopped 5:45 p.m. on February 26, 1996, by Sergeant Allen and other officers of the Tulsa Police Department. At that time Brown was removed from the car, handcuffed and taken to the Tulsa Police Department where he made a statement. As soon as Brown arrived at the station, Brown was searched and one hundred and four dollars in cash, including five dollar bills, was obtained from his person. Wilson implicated Brown sometime between 6:15 p.m. and 7:30 p.m. Brown was then interrogated at about 9:20 p.m., three hours after his arrival at the detective division.[9]

¶ 34 At the time Brown was detained, officers knew that Brown as well as a half dozen others were known associates of Wilson and that Brown had been arrested with Wilson ten days prior. Wilson was identified as being at the store during the time the murder occurred. Wilson's vehicle had been seen at the crime scene during the early morning hours of the 26th. The crime scene was discovered sometime before 6:15 a.m. A large safe had been taken from behind the counter indicating more than one perpetrator. The videotape from the security monitor had been taken. Money from the cash register was taken. A large number of five dollar bills were taken. Another occupant of the vehicle, Harjo, had in his possession a large number of five dollar bills.

¶ 35 We must first determine when the detention of Brown became a full blown arrest requiring probable cause. As a

---

7. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

8. Brown's attorney specifically objected to the introduction of the statement on grounds raised in camera and as the fruits of an illegal arrest.

9. Brown does not raise as error in this appeal the admission of the money, but he did object to its admission at trial.

passenger in a vehicle stopped for valid reasons, Brown's initial detention was valid. The vehicle stop was valid because officers had probable cause to arrest Wilson, another passenger in the vehicle. *See United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985), and *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989) (the stop of a vehicle and its occupants constitute a seizure within the meaning of the Fourth Amendment); *See also United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (stop based on violation of law is valid under the Fourth Amendment). However, once officers had control of the situation and had Wilson in custody, the reasonableness of Brown's seizure became questionable.

¶ 36 In *Prock v. State,* 1975 OK CR 213, ¶ 18, 542 P.2d 522, 526, we stated:

> Under appropriate circumstances police officers, in the course of their duty, may approach and question suspicious individuals in order to determine their identity or to maintain status quo momentarily while obtaining more information, even though there are insufficient grounds for arrest.

The officer's actions, however, must be reasonable in light of the facts and circumstances known to him at the time he made the stop. *Martin v. State,* 1980 OK CR 105, ¶ 16, 620 P.2d 446, 449; *See also, Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), and *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, (1983). These three cases provide the framework for investigatory stops requiring less than probable cause. A reasonable suspicion is sufficient for these types of stops. *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880. Reasonable suspicion has been described as "a particularized and objective basis" for suspecting a person is involved in criminal activity. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

¶ 37 Clearly Brown was not free to go, and he became the focus of a police investiga-

tion. His continued detention falls within the *Terry–Royer–Place* exception only if the officers had a reasonable suspicion that Brown was involved in criminal activity, and only if the seizure did not become unreasonably intrusive. *Skelly v. State,* 1994 OK CR 55, ¶ 13, 880 P.2d 401, 405.

¶ 38 Nothing was learned at the scene of the stop to connect Brown to the robbery other than the fact that he was a known associate of Wilson and that he was in the company of Harjo, who had a large number of five dollar bills. The five dollar bills linked Harjo to the crime and provided the second man for the State's "more than one person" theory. These facts still do not link Brown to the crime; therefore, officers could not have had a "reasonable suspicion" that Brown was involved in the robbery/murder.

¶ 39 Because there were no facts supporting a reasonable suspicion, there can be no facts supporting probable cause for the arrest of Brown.[10] "Guilt by association has never been an acceptable rationale and it does not constitute probable cause to arrest." *Smith v. State,* 1974 OK CR 143, ¶ 8, 525 P.2d 1251, 1253, citing *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1947). Because officers did not obtain even a reasonable suspicion that Brown was connected with this crime during the time period when Brown's detention was reasonable, the continued detention of Brown became unreasonably intrusive. In fact, when Brown was transported to the detective division, he was in effect "arrested."

> If an officer is momentarily detaining a person in order to make inquiry so as to determine his identity and obtain more information, and is in no way attempting to restrain him of his liberty or take him into custody, then the stop does not constitute an arrest, but rather is an investigatory detention. (citations omitted) In order to constitute an arrest, there must be some actual restraint of the individual's freedom of movement, or attempt to take the person into custody.

---

10. The State does not contend, nor do we find facts to refute the fact that Brown was "in custo-

dy" just after the vehicle was stopped.

*Ross v. State,* 1992 OK CR 18, ¶ 15, 829 P.2d 58, 62–63; *see Nelson v. State,* 1988 OK CR 48, ¶ 8, 755 P.2d 684, 686 (actual time of arrest occurred at the time appellant's liberty of movement was restricted). The facts indicate that Brown was actually restrained. There is no evidence that his trip to the detective division was voluntary. He was not free to leave.

¶ 40 Brown was taken from the vehicle, patted down and handcuffed. Allen testified at preliminary hearing that Brown was "arrested" within seconds of Wilson. Allen also testified that he "arrested" Brown because he was an associate of Wilson, had been arrested with Wilson before and he was with Wilson and Harjo within twelve hours of this crime. Because of the association, Allen "had him taken to the detective division for further investigation." Once Allen arrived at the station, he searched all of the defendants, including Brown. At trial Allen testified that Brown was searched after he was under arrest. The officers watching over Brown also believed that Brown was under arrest. Clearly in everyone's mind he was "under arrest" while at the station house. Even if officers were mistaken in their belief that Brown was "under arrest," his continued detention was not supported by a reasonable suspicion; therefore, his detention after the vehicle stop was completed and after the others were taken into custody was unreasonable.

¶ 41 Finding that Brown's detention was unreasonable under the circumstances, we must now determine whether the evidence obtained as a direct result of the arrest must be suppressed.

> Statements made by an accused subsequent to an illegal arrest are potentially fruit of the poisonous tree and should be suppressed unless the making of such statements was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). The Supreme Court in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), set forth several factors to be considered when determining whether the statements were obtained through the exploitation of the illegal arrest or whether they can be considered to have been voluntarily made. These factors include (1) the giving of *Miranda* warnings, (2) the "temporal proximity" of the arrest and the statements, (3) the presence of "intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." *Id.* 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The burden of showing that the statements at issue were voluntary and therefore admissible lies with the State. *Id.*

*Matthews v. State,* 1998 OK CR 3, ¶ 12, 953 P.2d 336, 341–42. In *Matthews* the appellant was interviewed as soon as possible after he was taken into custody. Appellant Matthews was apprised of his Miranda rights and signed a document acknowledging this; however, he was hesitant to talk. Nothing was found in *Matthews* that could have purged the taint of appellant's unlawful arrest.

¶ 42 The same analysis applies here. Brown was interviewed some four hours after he was taken into custody. Before he was questioned, Wilson confessed to the crime and implicated Brown. The *Miranda* rights were read to Brown. Brown did not request an attorney nor was one present during questioning. *Cf. McCarty v. State,* 1995 OK CR 48, ¶ 39, 904 P.2d 110, 122 (appellant's request for counsel and the compliance with this request operated as an intervening circumstance which purged the primary taint of the unlawful arrest).

¶ 43 Brown denied involvement at first, and only after being confronted with Wilson's statement, did he confess his involvement in the crimes. Wilson's confession does not supply the intervening circumstance which would allow this Court to find that his statement was not a product of his illegal arrest. In fact, we believe that it was the intention of the officers to first obtain a confession from Wilson while the others were in custody and then use Wilson's confession to prod the others into making incriminating statements. We find that this purposeful and flagrant violation of Brown's basic constitutional rights tainted his statement to police.

¶ 44 Having found Brown's statement tainted by the illegal arrest, we must determine whether this error requires relief. This error is of constitutional magnitude; therefore, Brown's conviction can only stand upon a finding that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967); *Wisdom v. State,* 1996 OK CR 22, ¶ 31, 918 P.2d 384, 393; *See also Hain v. State,* 1996 OK CR 26, ¶ 38, 919 P.2d 1130, 1141–1142 (an error, albeit constitutional, is subject to a harmless error analysis because it was an error in the trial process itself, and not a defect affecting the entire framework of the trial); *See also Arizona v. Fulminante,* 499 U.S. 279, 295, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (a majority of Justices hold that harmless error analysis applies to coerced confessions).

¶ 45 The burden rests with the State to demonstrate beyond a reasonable doubt that the illegally obtained statement did not contribute to the conviction. *Pickens v. State,* 1994 OK CR 74, ¶ 7, 885 P.2d 678, 682, *overruled in part on other grounds, Parker v. State,* 1996 OK CR 19, ¶ 23, 917 P.2d 980, 986. The State's brief in this case argues only that Brown's arrest was based on probable cause and does not comment on alternative theories allowing admission of the statement or a harmless-error analysis.

¶ 46 Our own analysis of this case reveals that Brown's statement consisted of the following. First, he stated that he was at his girlfriend's house at the time the crime occurred. Then, after being confronted with Wilson's confession, he confessed to being involved in the crime. Brown stated that he and the other codefendants attacked Yost while he was near the freezer area. They took Yost to the back room where he held Yost's arm down while Harjo beat him to death with a baseball bat, striking him fifteen to twenty times. Brown stated that he stayed in the back room the whole time so that no one would enter the back room. Brown stated that Wilson and Alverson planned the robbery two weeks in advance.

¶ 47 In reviewing this improperly admitted statement, we will review the remainder of the evidence against Brown to determine whether the admission of the improperly admitted evidence was harmless beyond a reasonable doubt. *Hain,* 919 P.2d at 1142. The State presented a substantial amount of properly obtained evidence connecting Brown to the crime other than his statements to police. The State presented the video surveillance tape which captured the defendants attacking Yost and dragging him into the back room. Brown was positively identified on the video surveillance tape and on a thermal image made from the tape. Brown, in the video, is seen dragging Yost into the back room and not coming out during the time the video is running. The diagrams indicate that there is no other way in or out of the back room other than the door shown in the surveillance video. The State presented evidence that Brown was with Wilson and the other two defendants within twelve hours of the crime when officers stopped Alverson's vehicle.

¶ 48 The video alone was sufficient to show, beyond a reasonable doubt, that Brown was an accomplice in the first degree murder of Yost. When viewing all of the evidence, excepting Brown's confession, we can honestly say that the introduction of the confession during the first stage of trial was harmless beyond a reasonable doubt. Therefore, Brown's convictions must not be disturbed based on this proposition.

**B.**

¶ 49 In proposition three and in parts of propositions four and five Brown complains about the introduction of DNA test results. Brown first argues, in proposition three, that the trial court erred in allowing the introduction of DNA test results without holding a hearing on the reliability of the tests. At trial Brown did not object to the admission of the DNA evidence on the basis that the evidence was unreliable or irrelevant. Brown only objected that the results of the tests should not be admitted because the results were not turned over to him until a few days prior to trial. Therefore, based on this particular argument, Brown has waived all but plain error.

¶ 50 The DNA test used was the PCR or Polymerase Chain Reaction test. Prior to Brown's trial, this specific test had not been approved by this Court. However, in *Wood v. State*, 1998 OK CR 19, ¶ 40, 959 P.2d 1, 11, we determined that the PCR test was reliable and admissible in the State of Oklahoma. We find that the introduction of the DNA/PCR test results did not amount to plain error.

¶ 51 In part of proposition four Brown claims that the trial court erred in allowing introduction of the DNA evidence because the State failed to comply with the Oklahoma Discovery Code. Alternatively, Brown claims that the trial court should have granted a continuance before allowing the introduction of the DNA evidence.

¶ 52 In response to Brown's discovery motion, the prosecution notified Brown's counsel, by phone, on Friday January 24, 1997, ten days before trial, that he could come by and pickup additional discovery, which consisted of a copy of the entire file. On January 27, trial counsel obtained the discovery material. Brown now complains that this notice was insufficient and that the results of the DNA tests, as well as other test results and items of tangible evidence, should have been excluded from the trial.

¶ 53 Title 22 O.S.1991, § 2002(A)(1) provides, in part, that the State shall disclose, upon request by the defense, "names and addresses of witnesses which the State intends to call at trial" with their statements or summaries thereof, any results of scientific tests, experiments or comparisons and any tangible objects which the prosecution intends to use in the trial.

¶ 54 Brown's counsel asserted that he did not learn the results of the forensic analysis until he picked up the materials on January 27, 1997. During the motion hearing on January 27, the prosecutor stated that he had made a statement at a prior motion hearing that the DNA reports would be available for all parties. The trial court also recalled the statement. Some mention was made that this occurred at the hearing held on October 30, 1996, but the transcript of that hearing does not contain such statements. The trial court did not recall wheth-er the conversation was on the record or not. The trial court took counsel's motion to exclude the evidence under advisement and gave the attorneys time to read the reports and appear at a later date. The trial court specifically found that the State complied with the discovery code by disclosing the evidence on January 24. On February 3, 1997, the trial court denied counsel's motion to exclude the DNA evidence and the motion for a continuance.

¶ 55 Based on the facts available to the trial court, we cannot say that the trial court abused its discretion in finding that the State complied with the Discovery Code. Furthermore, the trial court did not abuse its discretion in failing to exclude the DNA evidence or in failing to grant a continuance.

¶ 56 In the fifth proposition Brown complains that there was an insufficient chain of custody for items undergoing DNA analysis, serology examination, and other testing. Brown complains about the DNA testing conducted by Cindy Brown on blood found on a shoe, the steering wheel of Wilson's vehicle, items found on Wilson's porch (including a QuikTrip jacket, a Nike jacket, a paper sack, a latex glove, and an aluminum baseball bat). Brown complains about Yorkston's testing of items included above as well as the handcuff. Brown also complains about Yorkston's testimony regarding a piece of amber glass which presumably matched glass found at the scene.

¶ 57 At no time during Yorkston's or Cindy Brown's testimony did Brown object on the grounds that there was an insufficient chain of custody for the blood analysis. Counsel did object to the admission of items, from which blood samples were taken. However he did not object to the chain of custody of the blood samples after they were taken from these items of evidence. Then at the end of the State's case, pursuant to the trial court's procedure, defense counsel made general objections to the evidence already admitted. The trial court found that there was no substitution or tampering of the evidence, and the evidence "was in substantially the same condition at the time it was offered as

it was at the time when the crime was committed."

¶ 58 "The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed." *Middaugh v. State,* 1988 OK CR 295, ¶ 16, 767 P.2d 432, 436. While it is the State's responsibility to show the evidence offered is in substantially the same condition at the time of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated. *Williamson v. State,* 1991 OK CR 63, ¶ 46, 812 P.2d 384, 398, *cert. denied,* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). If there is only speculation that tampering or alteration occurred, "it is proper to admit evidence and let what doubt there may be go to its weight rather than render the evidence completely inadmissible." *Contu v. State,* 1975 OK CR 55, ¶ 13, 533 P.2d 1000, 1003.

¶ 59 We find that the items from which blood samples were taken were properly admitted because witnesses identifying these items testified that they were in the same condition as they were when they were found. However, Brown did not object to the handling of the blood samples taken from these items at the time evidence was introduced regarding the blood analysis. Although his cross-examination of Yorkston questioned the handling of the blood samples, he still did not object to the evidence of blood analysis based on a lack of a chain of custody. Therefore, Brown has waived the issue he now presents. Absent an objection, we can review for plain error only. We find that the admission of testimony regarding the testing of samples of bloodstains did not rise to the level of plain error.

¶ 60 Also, under proposition four, Brown complains about the chain of custody of pieces of amber glass which were recovered from the bag found on Wilson's mother's front porch. Yorkston testified that this piece of glass matched glass found near the victim by fitting together like puzzle pieces. Brown did not offer a contemporaneous objection to this testimony. We find that the introduction of this evidence did not rise to the level of plain error.

¶ 61 Under the remainder of proposition four, Brown complains that other evidence was introduced in violation of the Discovery Code. Witness Carol Cox testified that a metal fragment imbedded in the victim's head came from handcuffs found. This evidence was disclosed on January 24 along with the DNA test results. As with the DNA test results, the Discovery Code was followed. Therefore, the trial court did not abuse its discretion in allowing this evidence.

¶ 62 An objection was made to testimony from Officer Makison and Danny Boaz, a QuikTrip supervisor, that they could identify the defendants on the store videotapes and still pictures made from the tapes. The objection was partially based on the fact that there had been no discovery on that issue. The trial court found that the police reports were sufficient to give notice that Makison was going to identify the defendants on the tapes. Furthermore the tapes were provided to the defense through discovery. During the motion hearing of January 30, the trial court ruled that there would be no surprise in having Boaz identifying the defendants on the video as he had prior knowledge who the defendants were through personal contact. Absent any evidence to the contrary, we cannot say that the trial court abused its discretion in allowing the identifications.

¶ 63 Lastly, Brown complains about testimony from John Johnson regarding the policy and procedure that employees of QuikTrip were to follow if they were robbed. Brown's attorney objected because it was not part of the discovery. The trial court overruled the objection and allowed the testimony. We cannot determine whether the evidence was or was not provided through discovery. However, this witness was endorsed on the original Information and the prosecutor, at the January 27 motion hearing, advised the trial court that they had turned over information about' endorsed witnesses' testimony. Based on the entire record, we find that, even if this testimony was not included in the discovery information, its

introduction was harmless beyond a reasonable doubt.

## V. FIRST STAGE INSTRUCTION ISSUES

¶ 64 In proposition nine, Brown argues that the trial court erred in refusing to instruct on the lesser included offense of second degree felony murder. Brown claims that there was evidence supporting the view that the murders occurred during the course of robbery by force and fear, a lesser included offense of robbery with a dangerous weapon. We do not agree.

¶ 65 "Robbery, the predicate felony in second degree felony murder, cannot be accomplished with a dangerous weapon. If it is, the offenses are Robbery with a Dangerous Weapon and first degree felony murder." *Foster v. State,* 1986 OK CR 19, ¶ 31, 714 P.2d 1031, 1039. In this case, the evidence clearly showed that the victim was beaten to death with a baseball bat, a dangerous weapon which was used to complete the robbery. Where there is no evidence to support a lesser included offense the court has no right to ask the jury to consider the issue. *Boyd v. State,* 1992 OK CR 40, ¶ 9, 839 P.2d 1363, 1367–68. There was no evidence other than the· evidence that a dangerous weapon was used to commit the robbery. Accordingly, we find no error.

## VI. DOUBLE JEOPARDY

¶ 66 In proposition ten, Brown claims that his conviction for robbery with a dangerous weapon and first degree murder violate the prohibition against double jeopardy. At Brown's request, the trial court gave a general first degree murder verdict form to the jury. The trial court instructed that they could find Brown guilty of first degree murder under either of the alternative theories. Based on this record, there is no way of determining whether the jury found Brown guilty of malice murder or felony murder. When a defendant is charged with alternative theories of murder and the jury's verdict form does not specify under which theory, malice murder or felony murder, the defendant was found guilty then "the verdict must be interpreted as one of felony-murder in order that appellant receive the benefit of the rule that a defendant cannot be convicted of felony-murder and the underlying felony." *Munson v. State,* 1988 OK CR 124, ¶ 28, 758 P.2d 324, 332, *cert denied,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

¶ 67 Because it is impossible to determine under which theory of first degree murder Brown was convicted, we must order that his conviction for robbery with a dangerous weapon be dismissed.

## VII. SECOND STAGE ISSUES

### A.

¶ 68 We now turn to the effect that Brown's improperly introduced confession had in sentencing. Brown claims in the first part of proposition twelve that there was insufficient evidence to prove that the murder was especially heinous, atrocious, or cruel. Even without his confession we find that the evidence was sufficient.

¶ 69 All evidence introduced during first stage was incorporated during second stage. Brown stated, in the confession, that Yost didn't say anything once he was hit on the back of the head with the baseball bat, but he was hollering before that. After Yost fell to the ground, Brown said that Yost was breathing "real hard" and "[h]is side was moving up and down." This could be considered evidence of conscious physical suffering in support of the especially heinous, atrocious or cruel aggravating circumstance. However, this was not the only evidence introduced to support this aggravating circumstance.

¶ 70 The medical examiner testified that the first blow by the baseball bat could have rendered him unconscious. However, before the baseball bat was ever introduced into the attack, Yost was attacked and dragged into the back room by his four assailants. Yost screamed for help while Alverson and Harjo retrieved the bat. Obviously he was being restrained at that time by Brown and Wilson. Yost suffered injuries to his hands, arguably coming from the blow from the bat, indicating defensive wounds. There was a piece of metal from the handcuff imbedded in Yost's

head indicating that he had his hands between his head and the bat. In the surveillance tape noises can be heard during the attack after the baseball bat was taken to the cooler where Yost was being held. Once the bat arrived, it is possible that Yost was struck and rendered unconscious with one blow. However, we find that before the bat was brought into the attack, Yost had suffered the extreme mental anguish of being held captive, knowing that his ultimate fate rested in the hands of his attackers whom he could identify if left to live.

¶ 71 In *Cheney v. State,* 1995 OK CR 72, ¶ 15, 909 P.2d 74, 80, we said:

[T]his Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created." (citations omitted.)

¶ 72 There is ample evidence of the extreme mental anguish suffered by Yost prior to his death. This evidence illustrates the realization by Yost that he was going to be harmed and even killed by the gang of robbers who had overpowered him and dragged him into a back room. *See Neill v. State,* 1994 OK CR 69, ¶¶ 64–65, 896 P.2d 537, 556 (1994), *cert. denied,* 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996).

¶ 73 We find that there was sufficient evidence to prove the especially heinous atrocious and cruel aggravating circumstance even without Brown's statement to police. We can confidently say, beyond a reasonable doubt, that the introduction of the statement did not affect the outcome of the second stage of trial.

¶ 74 In the second portion of this proposition, Brown claims that the especially heinous, atrocious, or cruel aggravator does not apply to him because he did not inflict the serious physical abuse, nor did he intend that such abuse be inflicted. Brown, citing *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), correctly claims that, in a felony murder prosecution, the State must at least show that the accused substantially participated in the killing.

¶ 75 As we stated before, we will presume that the jury convicted Brown under the felony murder theory, so that Brown will be provided the benefit of the prohibition against double jeopardy. We make the same presumption here.

¶ 76 The evidence was clear that Brown substantially participated in the killing. Brown was involved in the initial subduing of Yost. He was present in the back room when the bat was brought in by Harjo. He was present when sounds of the first blow can be heard on the audio/videotape and he remained in the back room until the beating ceased. He had to know that a beating with a baseball bat would cause serious conscious physical suffering and death. Therefore, we find that Brown "was a major participant in the felony committed, who displayed reckless indifference to human life;" therefore, he was "sufficiently culpable to receive the death penalty." *Allen v. State,* 1994 OK CR 30, ¶ 15, 874 P.2d 60, 64 (citing *Tison,* 481 U.S. at 158, 107 S.Ct. at 1688).

¶ 77 In proposition fourteen Brown claims that the "especially heinous, atrocious or cruel" aggravator does not perform the constitutionally required narrowing process. The "heinous, atrocious or cruel" aggravator has been analyzed thoroughly and, when properly limited by the conditions precedent of torture or serious physical abuse, found to be consistent with the mandates of the Eighth and Fourteenth Amendments. *Toles v. State,* 1997 OK CR 45, ¶ 60, 947 P.2d 180, 192. We decline the invitation to deviate from our previous holdings.

### B.

¶ 78 In proposition fifteen Brown claims that the continuing threat aggravating circumstance does not serve the necessary narrowing function; the instructions defining this aggravating circumstance do not adequately narrow the circumstances for which a death penalty can be assessed; and lastly, the evidence was insufficient evidence to show that Brown was a continuing threat to society.

¶ 79 We have previously held that the "continuing threat" aggravating circumstance is neither vague nor overbroad. *Toles*, 947 P.2d at 192. We decline reconsideration of our previous decision in this regard. Counsel failed to object to the instructions defining the continuing threat aggravating circumstance. Therefore he has waived all but plain error. We find that the Uniform Instruction on the continuing threat aggravating circumstance tracks the language of the statute as well as language found in our case law. *Malone v. State*, 1993 OK CR 43, ¶ 38, 876 P.2d 707, 716; 21 O.S.1991, § 701.12(7). Because the instruction is based on the language of the statute as well as on our case law, there is no error in the instruction. It correctly performs the narrowing processes necessary to be constitutionally acceptable.

¶ 80 Lastly, the evidence was sufficient from which the jury could find the possibility that Brown would commit future acts of violence which would constitute a continuing threat to society. The State introduced evidence that Brown, in three different instances, had illegally in his possession loaded firearms. The State also introduced evidence that Brown had been involved in the beating of a female. These prior criminal activities provided sufficient competent evidence to support the continuing threat aggravating circumstance. *Humphreys v. State*, 1997 OK CR 59, ¶¶ 35–36, 947 P.2d 565, 576–77.

### C.

¶ 81 Brown claims in proposition sixteen that the instructions on the issue of mitigation allowed the jury to disregard mitigating evidence. The language of the standard instructions has been considered thoroughly by this Court, and we find it properly instructs the jury on the use of mitigating evidence. *Toles*, 947 P.2d at 193. The standard OUJI–CR 2d instructions on aggravators and mitigating evidence were given in this case. Accordingly we find no error here.

### D.

¶ 82 In proposition thirteen, Brown asserts that his death sentence must be vacated because the jury was exposed to inadmissible victim impact evidence. In this case, two members of the victim's family read prepared statements which had previously been approved by the trial court. Brown's attorney objected to the victim impact evidence only after the family members had testified. An objection made after a witness' testimony has concluded is untimely. *Campbell v. State*, 1969 OK CR 297, ¶ 3, 462 P.2d 349, 350. Consequently, we will review for plain error only. *See Douglas v. State*, 1997 OK CR 79, ¶ 74, 951 P.2d 651, 673, *cert. denied*, —— U.S. ——, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998)

> This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a victim's rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." However, "evidence may be introduced 'that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment."

*Willingham*, 1997 OK CR 62, ¶ 57, 947 P.2d 1074, 1086 (citations and footnotes omitted).[11]

---

11. While I recognize that a majority of this Court has held that both "victim impact evidence" under 21 O.S.Supp.1997, § 701.10(C) and "victim impact statements" under 22 O.S.Supp.1997, §§ 984 and 984.1 are admissible before a jury in a capital sentencing procedure, I continue to be of the opinion that only "victim impact evidence," defined in section 701.10(C) as evidence about the victim and the impact of the murder on

Our statutory language is clear, the evidence in a victim impact statement is to be limited to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim.

*Conover v. State,* 1997 OK CR 6, ¶ 61, 933 P.2d 904, 920.

 ¶ 83 In this case, Brown complains about statements from the victim's wife stating she enjoyed cooking and ironing for the victim. This evidence is relevant to show the psychological, emotional and physical impact of the victim's death. Brown complains about the victim's mother's statements about Yost's long term plans for the future. The victim's mother also stated that the victim told her that he would take care of her in her old age and for her not to worry about the future. These statements were relevant to show the financial and emotional impact of the crime itself on the victim's survivors. Brown claims that the mother's statement was hearsay. Arguably the statement was not offered for the truth of the matter asserted, thus not hearsay. The statement was only offered to show that the victim's mother believed that the victim would take care of her financially in the future.

 ¶ 84 The victim's wife testified that the victim was especially fond of Christmas holidays because he was raised in a family that did not celebrate Christmas. The victim's Mother testified that she didn't have any problems with the victim as a child. Statements about a victim's childhood have no relevance in victim impact evidence. *See Cargle v. State,* 1995 OK CR 77, ¶ 80, 909 P.2d 806, 829 (pointing out victim's positive attributes as a child "in no way provides insight into the contemporaneous and prospective circumstances surrounding his death"). We find that these comments amounted to error, but they do not rise to the level of plain error, because they did not

go to the foundation of the case, or take from Brown a right essential to his defense. *See Willingham,* 947 P.2d at 1088.

¶ 85 Brown finally complains that the victim impact evidence in this case served as nothing more than a "superaggravator." We have previously held that victim impact evidence is very different and serves a different purpose than aggravation evidence. *Willingham,* 947 P.2d at 1086. The State is still required to prove at least one aggravator beyond a reasonable doubt before the death penalty may be imposed. *Id.*

¶ 86 In this case, the jury was specifically instructed that they could only consider the aggravating circumstances set forth in the instructions. Brown has not convinced us that the jury would not have found the aggravating circumstance but for the victim impact evidence. *Id.*

## IX. PROSECUTORIAL MISCONDUCT

¶ 87 Brown claims in proposition eleven that improper tactics and arguments of the prosecutor deprived him of a fair trial. Brown cites sixty-eight instances of alleged prosecutorial misconduct. The misconduct alleged includes comments made during voir dire, comments made during first and second stage opening statements and closing arguments, improper questioning of witnesses, and improper presentation of evidence which was not relevant, or the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, or needless presentation of cumulative evidence.

¶ 88 Of the comments made by the prosecutor, most were not met with a contemporaneous objection. We have reviewed these comments and find that they did not rise to the level of plain error. The trial court sustained objections to some of the comments, but no admonition was given. We find that any error was cured when the trial court sustained the objections. *Pennington v. State,* 1995 OK CR 79, ¶ 35, 913 P.2d 1356,

the family of the victim, is admissible before a jury in a capital sentencing proceeding.

It is my opinion that "victim impact statements," defined in § 984, and provided for in § 984.1, including circumstances surrounding the crime, the manner in which the crime was

perpetrated, and the victim's opinion of a recommended sentence, should only be presented to the trial judge at the formal sentencing proceeding. I also believe that the language of the legislature supports my position on this issue.

1369. In other cases, the trial court admonished the jury to keep in mind that the arguments and comments of the attorneys were not evidence and that they must rely only on their own recollection of the evidence. These admonitions cured all but plain error. There was no plain error. *See Charm v. State,* 1996 OK CR 40, ¶ 60, 924 P.2d 754, 770.

¶ 89 Brown claims that during the first stage the prosecutor presented evidence which was gruesome. Pictures, State's exhibits 19, 20 and 113, depicted the wounds to the victim and the crime scene. The photographs also aided the medical examiner in his explanation of the wounds to the victim and manner of death. Thus, they were relevant to show the cause of death and the intent of the attacker. The fact that they were gruesome does not make them inadmissible. Their probative value must be substantially outweighed by the danger of unfair prejudice. *Willingham,* 947 P.2d at 1083. Gruesome photographs are a result of gruesome crimes. *McCormick v. State,* 1993 OK CR 6, ¶ 10, 845 P.2d 896, 898. We find that they were properly introduced, thus there can be no prosecutorial misconduct for presenting the evidence.

¶ 90 Brown complains about evidence presented by the prosecutor in second stage. We find that of the exhibits complained about, all but one were relevant to show the events leading to death which were relevant to prove the aggravating circumstances. Therefore these photographs were probative. We find that the probative value was not substantially outweighed by the danger of unfair prejudice.

¶ 91 The sole photograph we find offensive is the post-autopsy photograph of the interior of the skull showing a hinge type fracture at the base of the skull (State's exhibit 115). We assume that this photograph was introduced to show the sheer force of the blows to the victims head. However, we fail to find the relevance of this photograph for second stage. Post-autopsy photographs generally are found to be inadmissi-

ble, for any probative value they have is substantially outweighed by prejudicial effect. 12 O.S.1991, § 2403. The relevance of this photograph is negligible because it shows the handiwork of the medical examiner rather than the defendant or his codefendants. Its prejudicial value is great because it tends to shock the general public unaccustomed to viewing the inside of the human body. *Sattayarak v. State,* 1994 OK CR 64, ¶ 8, 887 P.2d 1326, 1330; *Oxendine v. State,* 1958 OK CR 104, ¶¶ 6–8, 335 P.2d 940, 943. Here the probative value is outweighed by the danger of unfair prejudice. The prosecutor should have known that this photograph had little relevance and that its probative value would be substantially outweighed by the prejudicial effect, therefore, the prosecutor committed misconduct in offering this piece of evidence.

¶ 92 Though we find error in the admission of a photograph, such error does not always require reversal. *Darks v. State,* 1998 OK CR 15, ¶ 44, 954 P.2d 152, 164. To determine the prejudice incurred by the erroneous admission, we look to the nature of the other photographic evidence admitted at trial. In this case, photographs of the numerous wounds to the victim's head were properly admitted. These photographs were far more prejudicial than the sterile, clinical photograph of the inside of the victim's skull. And while the photograph of the interior of the skull was more prejudicial than probative, given the other, properly admitted photographs, we do not find that the jury imposed the death penalty because of its introduction. This error is harmless.

¶ 93 Brown claims that the prosecutor committed misconduct by offering evidence which was cumulative. Brown claims that the introduction of diagrams of Yost's injuries and the video of the crime scene was cumulative to the photographs already admitted. The diagrams of the injuries were relevant to assist the jury in understanding the medical examiner's testimony. The crime scene video gives the jury a walk through perspective of the crime scene.[12] This infor-

---

12. The video in this case does contain a narrative describing the scene; however, the volume was

turned off when shown to the jury. Therefore, the video is not prejudicial like the one I found

mation was relevant to prove the aggravating circumstances alleged by the State; that the murder was especially heinous, atrocious or cruel and that Brown would commit future acts of violence which would constitute a continuing threat to society. The introduction of these separately did not result in the needless admission of cumulative evidence. Therefore, the prosecutor did not commit misconduct in offering this evidence.

¶ 94 We find no prosecutorial misconduct which requires reversal of this case. Therefore, this proposition fails.

### X. CUMULATIVE ERROR.

¶ 95 Brown, in proposition eighteen, asks us to look to the combined effect of the errors if we determine that none of the errors singly requires reversal. We have found error occurring in both the first and second stages of this trial. None of these errors required reversal singly. In viewing the cumulative effect of these errors we also find they do not require reversal of this case. *Gilbert v. State*, 1997 OK CR 71, ¶ 101, 951 P.2d 98, 122, *cert. denied*, — U.S. —, 119 S.Ct. 207, 142 L.Ed.2d 170.

### XI. MANDATORY SENTENCE REVIEW

¶ 96 In proposition seventeen Brown claims that the mitigation outweighed the aggravating evidence, and in light of the error occurring during trial Brown asks this Court to modify his sentence. Under our mandatory sentence review in accordance with 21 O.S.1991, § 701.13(C), we must determine whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor and whether the evidence supports the jury's finding of the aggravating circumstance.

¶ 97 The jury found that there existed the probability that Brown would commit criminal acts of violence that would constitute a continuing threat to society, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and that the murder was especially heinous atrocious or cruel. 21 O.S.1991, § 701.12(4), (5) & (7). We have found that

offensive *Duckett v. State,* 1995 OK CR 61, ¶ 1–3,

these aggravating circumstances were supported by sufficient evidence.

¶ 98 The mitigating evidence was summarized into an instruction for the jury to consider. This evidence included Brown's positive family relationships; his cooperative and sensitive attitude towards family members; his young age (eighteen at the time of the crime); his personality of being a follower who was adrift at the time of the crime. The jury was instructed that they could determine other mitigating circumstances based on the facts of the case. After reviewing the record and carefully weighing the aggravating circumstances and the mitigating evidence, we find the jury's determination that the aggravating circumstances outweigh the mitigating circumstances is amply supported by the record.

¶ 99 We do not find that the jury's verdict of death was rendered because of the influence of passion, prejudice or any other arbitrary factor. It was not rendered because of any errors occurring during the trial or the prosecutors' alleged misconduct. Therefore, we will not disturb Brown's sentence as he requests.

¶ 100 We have found that Brown's conviction for robbery with a dangerous weapon must be **REVERSED** and **REMANDED** with instructions to **DISMISS**. We find no error warranting reversal of the conviction or sentence of death for first degree murder; therefore, Judgment and Sentence for the crime of murder in the first degree in the District Court of Tulsa County is **AFFIRMED**.

JOHNSON, J., concurs.

STRUBHAR, V.P.J., and LUMPKIN, J., concur in results.

CHAPEL, P.J., dissents.

CHAPEL, P.J., dissenting.

¶ 1 I would reverse and remand this case for a new trial as I find merit in Brown's first proposition of error. The majority finds error but resolves the error by judging it harmless. In so doing, the majority winks at

919 P.2d 7, 27 (Lane, J. concurring in result)

a very serious constitutional violation. The majority justifies its action by noting that evidence, other than that which ought to have been excluded, proves Brown was guilty. My own view is that in the case of serious constitutional errors, this court should reverse and require the State to do it right. If, as the majority argues, the evidence was otherwise sufficient, the outcome will be the same. But this Court by its action would have upheld the constitution. Winking at serious constitutional errors, while expedient, degrades and demeans our rights.

LUMPKIN, J., concurs in results.

¶ 1 I concur in the result reached in this case. I do not agree with portions of the rationale, however, and therefore I write separately to address those points of disagreement.

¶ 2 First, Appellant in this case was a party to the Petitions for Extraordinary Relief set out in Footnote 2 of the Court's opinion. The issues raised have been judicially determined. Within the context of criminal procedure that judgement is *res judicata* and Appellant is procedurally barred from raising the issue a second time. The opinion confuses collateral estoppel with the doctrine of res judicata, i.e. claim preclusion. Rather than use that approach, we should simply state the claim is procedurally barred by *res judicata.*

¶ 3 Second, while I am of the opinion Oklahoma law does not prevent the trial court, in the exercise of its discretion, from impaneling dual juries, I remain skeptical regarding the value of this procedure, especially in capital cases. Although I do not find reversible error occurred in the instant case, some of the issues raised by Appellant are illustrative of future problems we will likely encounter when dual juries are impaneled. Rather than broadly endorsing the dual jury procedure, as did the majority in *Cohee v. State,* 942 P.2d 211, 213 (Okl.Cr.1997) (Lumpkin, J. Concurring in part, dissenting in part), I will continue to monitor its impact on the trial on a case-by-case basis.

¶ 4 Third, with respect to proposition eleven, I believe the opinion goes too far in its discussion of post-autopsy photographs. While I agree with the general principal that post-autopsy photographs should be viewed with a certain degree of suspicion because of their potential to be more prejudicial than probative, we must recognize that post-autopsy photographs may have their place in certain cases. *See Mitchell v. State,* 884 P.2d 1186, 1196 (Okl.Cr.1994) (post-autopsy photograph more probative than prejudicial). In addition, the post-autopsy photograph of the interior of the skull which revealed the hinge type fracture at the base of the skull did not show "the handiwork of the medical examiner". It showed the level of force used by Appellant and his co-defendants as they beat the victim to death. If this injury had been visible on the outside of the victim's body, a photograph of those injuries would have been admissible regardless of how prejudicial it might have been. As the Court recognizes "photographs of the numerous wounds to the victim's head suffered by the victim were properly admitted. These photographs were far more prejudicial that the sterile, clinical photograph of the inside of the victim's skull". Opinion at 934. I find the photograph was admissible and no error occurred.

¶ 5 Finally, I cannot concur with the analysis used in the opinion in resolving propositions one (lack of probable cause) and eleven (prosecutorial misconduct).